[S. F. No. 9329. In Bank.—October 11, 1920.]

In the Matter of the Estate of HENRY CASAROTTI, Deceased. ROMEO CASAROTTI, Respondent, v. CORNELIUS P. LYONS, Appellant.

[1] ESTATES OF DECEASED PERSONS — WILL CONTEST — MENTAL INCOMPETENCY—BURDEN OF PROOF.—In a proceeding to revoke the probate of a will on the ground of mental incompetency, the burden of proving the incompetency rests with the contestants.

[2] ID.—MENTAL INCOMPETENCY — SUPPORT OF VERDICT — REVIEW OF EVIDENCE.—In determining the sufficiency of the evidence to support a verdict and judgment revoking the probate of a will on the ground of mental incompetency, the testimony of proponent's witnesses must be taken into account, as well as the evidence of the contestants.

[3] ID.—MENTAL CONDITION PRIOR AND SUBSEQUENT TO EXECUTION OF WILL—EVIDENCE—TESTIMONY OF ATTENDING PHYSICIAN.—In a proceeding to revoke the probate of a will on the ground of mental incompetency, the attending physician's testimony as to the testator's mental condition before and after the execution of the will is admissible only as it tends to show such condition at the very time the will was made.

[4] ID.—WEAKNESS AND IMPAIRMENT OF FACULTIES — EFFECT UPON TESTAMENTARY CAPACITY.—It is not every weakness and impairment of the faculties of the testator that will invalidate a will. Even where a testator is feeble in health, suffering under disease and aged and infirm, yet if he was of sufficiently sound mind to be capable of understanding the nature and situation of his property, and of disposing thereof intelligently, without any delusions affecting his action, he had sufficient capacity to make a will.

[5] Id.—Inability to Articulate—Communication by Signs—Lack of Presumption of Incompetency.—The fact that a testator is unable to speak articulately and is compelled to communicate by signs does not raise a legal presumption of incompetency to make a will.

APPEAL from a judgment of the Superior Court of Sonoma County. Emmet Seawell, Judge. Reversed.

The facts are stated in the opinion of the court.

G. P. Hall and W. F. Cowan for Appellant.

Frank O. Nebeker and G. W. Hoyle for Respondent.

SLOANE, J.—This is an appeal from a verdict and judgment revoking probate of a will. The will was contested on grounds of undue influence and incompetency. On the trial the question of undue influence was by the court taken from the jury for insufficient evidence on motion for a nonsuit. The only question on this appeal is as to the sufficiency of the evidence to support the judgment on the ground of the testator's mental incompetency to make a will. The only evidence offering support to the claim of contestants on this point was the testimony of the physician in attendance upon the testator during his last illness and covering the period when the will was executed.

One of the grounds of error relied on by appellant is the admission of this testimony over appellant's objection that the physician's testimony was inadmissible under subdivision 4 of section 1881 of the Code of Civil Procedure, for the reason that it was the disclosure by a physician of information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

The patient, in this instance, was suffering from pneumonia. Though it was primarily for the trial judge to weigh the facts upon which the admissibility of this testimony depends, it is doubtful if it sufficiently appears to support the court's ruling that the observations made by the doctor as to the patient's mental competency were merely incidental and were not necessary to his treatment of the disease, or were not of a nature to come within the protection of professional confidence. (*Estate of Black,* 132

Cal. 392–396, [64 Pac. 695] ; *In re Redfield,* 116 Cal. 644, [48 Pac. 794].)

If, however, it does not appear that there was error in admitting this evidence, we do not think, in any event, it was sufficient to support the verdict. [1] The burden of proving incompetency rested with the contestants. There was no pretense that the testator was delirious, irrational, or insane or under any delusions, but merely that he was in such a state of bodily weakness and mental stupor as to be incapable of an intelligent disposition of his property or determination of the objects of his bounty. It is also urged that his condition of weakness was such as to render him peculiarly susceptible to suggestion. The issue of undue influence having been eliminated, there is no evidence of influence or suggestion of any kind tending to direct his testamentary acts. The evidence is wholly to the effect that he personally and voluntarily suggested the parties to be the beneficiaries of his will, and his desire that all his property should go to them, and even enumerated the various possessions that were to be carried by the general terms of the will. Neither was there anything in the disposition of his estate to strangers by blood, to the exclusion of his several brothers or sisters, to render it obnoxiously unnatural.

The testator, Henry Casarotti, was unmarried, and evidently a comparatively young man. His next of kin were his brothers and sisters, some nine in number. He had for some time been living in the family of Cornelius P. Lyons and the latter's wife, who are the beneficiaries of the will, and proponents of the will, and appellants in this action. His relations with his own people, while not unfriendly, seem to have been not overly cordial because of their objections and criticisms of his relations with the Lyons family, and because of some differences arising in the distribution of their father's estate through which Henry Casarotti derived most of the property transferred by this will. His relations with Mr. and Mrs. Lyons had been friendly and intimate for a considerable period and he was living at their home at the time of his last illness and death. He was taken down with an attack of influenza six days prior to his death. This had developed into pneumonia. He died on the 19th of September, 1919, at about 3 in the afternoon.

Dr. Gossage, the attending physician, and witness here, visited him about 8 o'clock in the forenoon and again at 12 or 1 o'clock, and did not thereafter see him alive. The will was made between 9 and 10 o'clock in the forenoon. The doctor found him very low at his first visit on the morning of the 19th. He was breathing with difficulty and in a state of stupor bordering on coma. The doctor testifies that death was imminent. He told his patient that if he had any affairs to settle he had better send for his lawyer, and on the patient's acquiescence and the subsequent suggestion of Mrs. Lyons, upon leaving the house the doctor telephoned to G. P. Hall, the attorney who prepared the will, that he was to visit Casarotti's sick-bed for that purpose. Obviously, the doctor at the time of this suggestion as to settling his affairs and making a will contemplated sufficient intelligence and competency on the part of the sick man to give some consideration to winding up his earthly business. The will was executed between the doctor's first and second visits, within an interim of two or three hours. On the second visit he found his patient in a similar state of stupor with evidence of the nearer approach of dissolution. His testimony covering physical and mental symptoms observed at both visits is in substance as follows:

"I saw him alive, I think, about 12 or 1 o'clock on the day he died. I had seen him that morning prior to that" (about 8 o'clock). "His mental condition was such that he was very stupid, comatose condition." "I never saw him very delirious to amount to anything. He was sinking at time of first visit. I probably told him if he had any property to dispose of he had better have a will made. I telephoned after I left to the attorney." "I could not say he was irrational but he was in a stupid condition." "I had to talk to him, rouse him up to get him to say anything." "I did not mean to say he was irrational at all after he woke up." "He was not taking any opiates or medicines to make him stupid." "When he was aroused he seemed to answer all my questions rationally." "He seemed to understand in a way when I told him to make a will. He did not seem to pay much attention to me. I thought in a way he comprehended what I was saying to him." "He was not insane because he was not in full possession of his faculties." "Q. When he was aroused he was all right? A. I would

not hardly say he was all right. He was not as bright and intelligent by any means as he was when he was well." "The man was in a bad condition in every way, he was very weak, but his reason had not left him. I think his mental condition was such that any person of ordinary intelligence could understand it as well as a physician." "I visited him again between 12 and 1 o'clock. He was then in a rather worse condition," "There was discoloration in his face." "He was not of sound mind on the occasion of my visits that day." "From being in the condition he was at 8 o'clock I don't think he would be thoroughly in possession of his faculties and be able to determine who was about him by 10 o'clock." "He knew me when I was there." "Q. For aught you could tell us Henry Casarotti may have been perfectly clear in his mind had he been thoroughly aroused after you were there on the morning visit? A. He might have been. I presume he was not, but he might have been." "When I suggested he had better fix his affairs up and send for his attorney I don't remember just what words he used, though he gave me to understand that he wanted to do that. I would say he was very weak mentally and physically." "He had no mental disease. He was just suffering from lack of strength." "I think he was in a condition that morning if out from under his stupor to say what he would like to have done with his property, or to know his sister if she came into the room. I think if he was thoroughly aroused he would know these things." "He would remain awake after he was aroused a short time, just a few minutes. I remember it required speaking to him rather loudly, possibly more than once, to arouse him." "I think I was in the room about ten minutes on that occasion."

This summary fairly states the substance of Dr. Gossage's testimony on this point. Together with the other circumstances herein narrated it constitutes the entire evidence in support of the allegation of incompetency.

Even in the absence of direct evidence of the conditions attending the execution of the will it may be doubted if it would support the finding of the jury as to incompetency. The jury would hardly be justified in inferring from this testimony as to the condition of the testator an hour or two before and an hour or two after the will was executed that he would not have been sufficiently aroused by the presence

and efforts of his lawyer to intelligently dispose of his property at the intermediate time.

[2] But the issue does not rest upon the contestant's evidence alone. The testimony of proponent's witnesses must be taken into account in weighing the sufficiency of contestant's case. Evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence. *In re Redfield,* 116 Cal. 637, [48 Pac. 794], is a case in which the showing of incompetency was stronger than here, where this court held that in the light of all the facts it was entirely inadequate. In the matter before us there is no conflict in the evidence. The conditions stated by the attending physician at the periods to which he testifies are not disputed, but two apparently disinterested witnesses, the lawyer and the nurse, testify that at the time of the actual execution of the will, an hour or more after the doctor's first visit and an hour or more before his second visit, the patient was aroused and awake, his eyes open and showing intelligence; that he recognized his visitors and, though suffering, weak, and short of breath, talked coherently and with comprehension. The nurse testified that when Mr. Hall, the lawyer, called she had just been administering nourishment to the patient. There was no sign of his being irrational. "He seemed to understand everything said to him. His answers were intelligible. I was called in the room after Mr. Hall was there. Mr. Hall read the paper, the will, and asked Mr. Casarotti if that was his will and wishes and Mr. Casarotti said, 'Yes.'" There was no one beside Mr. Hall in the room while Mr. Hall was drawing the will. "Mr. Casarotti first turned on his right side and Mr. Hall asked him if he was left-handed and he said, 'No.'" They then turned him on his left side and he signed the will. "He did not ask anyone how to spell his name." "When Mr. Hall left he told Mr. Casarotti he hoped he would soon get well and Mr. Casarotti said, 'I hope so.'" "We aroused him for his treatment from time to time; he was perfectly normal then, that is, he was clear."

Mr. Hall, who drew the will, testified: "When I went into the room I says to him, 'Hello, Henry! What's the matter?' 'Well,' he says, 'I am pretty sick but I don't think I am

going to die.' I said, 'Did you want to see me?' and he said, 'Yes, I want to make my will.'" The witness then asked him what property he had, and in response the testator enumerated various items of property, which, so far as appears from the record, correctly and fully included all his estate. In answer to the query as to whom he wished to leave his property, he answered that he wanted to leave it to his "friends, Mr. and Mrs. Lyons." Asked as to their names, he said his name is "Con" Lyons, but he did not know what the "Con" stood for. The attorney then got the first names from Mr. Lyons, who was ill in another room. This witness further testified, "He was awake when I went into the room. He recognized me. He answered my questions intelligently. I saw nothing to indicate that he was irrational. My opinion is that he was perfectly sound in mind. I don't imagine I was there over twenty or twenty-five minutes. He was not in a state of stupor at any time I was there. There was no continued conversation, but his eyes were open and he showed intelligence and talked intelligently. He was breathing heavily, but no difficulty in his speech. No one held his hand while he signed the will."

Here we have the testimony of a lawyer whose professional duty it was to ascertain the condition of his client's mind, as much as it was the duty of the doctor to note his physical condition.

We think this state of the evidence shows competency to execute a will beyond any substantial question arising either from direct evidence of mental irresponsibility, or from any inference that might be found from the facts testified to as existing on the prior or subsequent visits of the doctor.

[3] The physician's testimony as to the testator's mental condition before and after the execution of the will was admissible only as it tended to show that condition at the very time the will was made. (*Estate of Wilson,* 117 Cal. 262, [49 Pac. 172, 711]; *Estate of Dole,* 147 Cal. 188, [81 Pac. 534].) But the doctor admitted that any conclusions he reached as to mental incompetency were based on the patient's weakness and stupor at the time of observation, and he admitted that he might have been aroused and that if aroused his understanding would be unclouded. The witnesses for the proponent of the will testify that he was so

aroused at the time the will was executed and that his mind and understanding were clear.

[4] It must be borne in mind that it is not every weakness and impairment of the faculties of the testator that will invalidate a will. Even where a testator is feeble in health, suffering under disease and aged and infirm, yet if he was of sufficiently sound mind to be capable of understanding the nature and situation of his property, and of disposing thereof intelligently, without any delusions affecting his action, he had sufficient capacity to make a will. (*Estate of Motz,* 136 Cal. 558, [69 Pac. 294]; *Estate of Purcell,* 164 Cal. 300, [128 Pac. 932]; *Estate of Hudson,* 163 Cal. 166, [124 Pac. 852]; *Estate of Weber,* 15 Cal. App. 224, [114 Pac. 597].)

[5] It was held that the fact of the testator being unable to speak articulately and was compelled to communicate by signs did not raise a legal presumption of incompetency to make a will. (*Estate of Latour,* 140 Cal. 415, [73 Pac. 1070, 74 Pac. 441].)

We are satisfied that the evidence was insufficient to support the verdict.

The judgment is reversed.

Shaw, J., Wilbur, J., Olney, J., Lennon, J., Lawlor, J., and Angellotti, C. J., concurred.