[S. F. No. 12018. In Bank.—December 22, 1926.]

In the Matter of the Estate of CHRISTOPHER Mc-DONOUGH, Deceased. DANIEL McDONOUGH, Respondent, v. ELIZABETH C. JOYCE, Appellant.

[1] ESTATES OF DECEASED PERSONS—WILLS—TESTAMENTARY CAPACITY—HALLUCINATIONS—DELUSIONS.—Proof of the existence of hallucinations or delusions is not alone sufficient to annul a will unless such hallucinations or delusions bear directly upon the testamentary act.

[2] ID.—WILL CONTEST—UNSOUNDNESS OF MIND.—In a will contest upon the ground of unsoundness of mind of the testator, the question to be determined is not what might have been the mental condition of the testator, but what in fact was his mental condition at the time he made the will.

[3] ID.—WILLS—SUBSCRIBING WITNESSES—PRESUMPTIONS—OPINIONS.—The law presumes that the subscribing witnesses to the execution of a will had their attention drawn to and noted the mental capacity of the testator; and the opinions of such witnesses are entitled to more weight than that of one who is merely passive.

[4] ID.—TESTAMENTARY CAPACITY—HARDENING OF ARTERIES.—It does not follow that testamentary capacity ceases with the approach of or even with the most advanced stages of arterial hardening; this condition or stage in life is but partial evidence to be considered in connection with other evidence in determining whether or not arteriosclerosis has shut off the blood supply to the brain to the extent that the mind is unable to correctly function.

[5] ID.—COMPETENCY—EVIDENCE.—In considering the question of a testator's competency, the issue does not rest upon the contestant's evidence alone, but the testimony of proponent's witnesses must be taken into consideration in weighing the sufficiency of the contestant's case; and evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence.

[6] ID.—INSUFFICIENCY OF EVIDENCE.—In this will contest it is held that the evidence is insufficient to sustain the judgment.

(1) 40 Cyc., p. 1015, n. 76.   (2) 40 Cyc., p. 1016, n. 84.   (3) 40 Cyc., p. 1036, n. 32.   (4) 40 Cyc., p. 1023, n. 24.   (5) 40 Cyc., p. 1923, n. 29.   (6) 40 Cyc., p. 1023, n. 29.

1. See 26 Cal. Jur. 676; 28 R. C. L. 104.
2. See 26 Cal. Jur. 635; 28 R. C. L. 97.
3. See 26 Cal. Jur. 751.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Thomas F. Graham, Judge. Reversed.

The facts are stated in the opinion of the court.

John C. Quinlan and James F. Brennan for Respondent.

Theodore J. Savage for Appellant.

SEAWELL, J.—On August 29, 1922, Christopher Mc-Donough made his last will and testament and died June 5, 1924, one year and nine months thereafter. At the time of his death he left surviving him his son, Daniel, the contestant herein, aged about forty-four years and a resident of Massachusetts. The other children of the testator, according to the testimony of Daniel, had died without issue prior to the death of the testator. By his will he devised his estate, which at the time his will was executed consisted of a sum of less than eight thousand dollars in bank, except the sum of one hundred dollars, to proponent, Elizabeth Joyce, the wife of Martin Joyce. The contestant by his action herein alleged two grounds of contest: First, undue influence, and, second, unsoundness of mind. A nonsuit was granted as to the first ground and the finding of the jury that the testator was of unsound mind at the time he executed the will was sustained by the trial court, and judgment was accordingly entered thereon annulling and revoking the probate of said will. The appeal is taken from the whole of said judgment.

There seems to be some uncertainty as to the exact age of testator at the time he made his will. It is probable that his age, as declared in the will to be seventy-eight years, was approximately correct.

The testator was a native of Ireland, unable to read or write, and by trade a street-paver. The date of his arrival in this country does not appear from the record, but it does appear that he was a resident of the state of Massachusetts in 1887. At that time his wife was living and he was the father of seven young children, contestant then being seven or eight years of age. It would seem that the home was destroyed by a cause not disclosed in the record, the parents

went apart, and the custody of the young children fell to the
father. The testimony of contestant, who was then but
seven or eight years of age, was to the effect that his father,
in 1887, placed said children in the care of an institution
conducted by the Roman Catholic Church. He never saw
his mother thereafter and saw his father but once, for a
short time in 1915, when the latter visited the son at his
home in Massachusetts. The record is silent as to the date
of the mother's death.

It seems that upon leaving Massachusetts, McDonough
resided for a time at Salt Lake City and finally took up his
residence in San Francisco in 1894, where he resided until
the day of his death, a period of approximately thirty years.
His early life was spent in the old world, where rigid
economy was a rule of necessity and saving became a fixed
habit, which he practiced during the entire earning period of
his life.

It is contestant's contention that prior to going to live
with the Joyce family the testator lived in a condition of
extreme squalor, which alone was sufficient to create a serious
doubt as to his sanity. Much stress is laid upon his method
of living covering a period of about three years. The first
insight given of his methods of living begins with the year
1901. In that year he became a roomer at a rooming-house
conducted by Mrs. Anna McManus, where he remained until
forced out by the fire and earthquake of 1906. Mrs. Mc-
Manus re-established herself after the fire and the testator
returned as a roomer. He remained at her house until 1915,
at which time he made a visit to his son, who was residing
in Massachusetts. After three months' absence in the east
he returned to San Francisco and again took a room at the
McManus home. He remained there until July, 1917, when,
against his wish, he was compelled to seek another rooming
place, as Mrs. McManus needed the room for her own pur-
poses. He then went to live with Michael Moran in South
San Francisco. It is claimed by several witnesses offered by
proponent that the "shack," as the building was described,
presented a revolting picture of squalor and filth. Para-
doxical as it may appear, several of the witnesses who ex-
pressed a pronounced feeling of disgust at the wretched con-
ditions that prevailed at the Moran place nevertheless sought
the companionship of McDonough and were very frequent

visitors at the home of filth. The principal witness to the unsanitary and filthy condition of the premises admitted that his visits often continued as long as two or three hours at a time. McDonough and Moran, according to the testimony offered by the proponent, lived in the state of wretchedness described by some of the witnesses for a period of about three years. McDonough, however, without apparently consulting his old associates, left the Moran place and established himself at the Joyce home. Giving full credit to the testimony of the witnesses as to the conditions existing at the Moran premises, it would seem that McDonough finally and fully awoke to a sense of realization of the degradation by which he was surrounded, as was evidenced by his resolve to enter a home where neatness and order prevailed, in which he might pass the remaining years of his life enjoying the comforts of a home and receiving the care and attention which only a woman's hands can administer. In quitting the Moran premises he certainly acted wisely. He had laid aside a sum sufficient in the ordinary course of nature to secure him against want.

Contestant produced witnesses who testified that testator was in the habit of picking up copper wire, mechanical bolts, nuts, broken pipes, and broken hairpins and safety-pins, tin cans, and cigar and cigarette stubs which he brought to his room. At times he complained of being dizzy and of seeing specks or spots in the air, and he also was heard to complain of pains in the back of his head and had been heard to say, "I wish I was dead." He had been known to fail to recognize an acquaintance upon meeting him on the street until such person made himself known. His eyes upon a few occasions appeared to be "starey" and sometimes he would "glare." It is said that at times he had worn copper wire about his wrist as a sort of talisman against aches and pains; that upon certain occasions he had fallen and had to be assisted to his home, and that he had fallen asleep while reclining outdoors and awakened after the rain had started to fall. Mental lapses, repetitions in conversation, loss of sense of location for the moment, and failure to appreciate the passing of time, as well as acts which may or may not be evidence of mental weakness, were testified to by witnesses called by the contestant. Thirty years of the testator's life were brought into review and the acts culled therefrom which it is claimed

show a want of testamentary capacity are wholly insufficient to sustain the judgment. The witnesses for contestant who testified as to the mental unsoundness of testator by virtue of the provisions of section 1870, subdivision 10, Code of Civil Procedure, which permits an intimate acquaintance to give an opinion of mental sanity of a person, the reason for the opinion being given, related certain acts and circumstances in support of their opinions which in point of time were somewhat remote from the exact time the will was executed. Much of the evidence amounts to nothing more than a conclusion and the reasons for the opinions given lack convincing force. Not one of contestant's witnesses was willing to say that testator was suffering from settled insanity. When put to the test, scarcely one was willing to say that he believed him to be "crazy" in the general sense of the term. Those most unfavorable to the theory of sanity said there were times at which the testator appeared to be mentally all right and there were times at which he appeared not mentally himself. The incidents which would indicate departures from the normal were the exceptions rather than continuous abnormal acts indicating a settled disturbed mental condition. The acts upon which the opinions rested may as well be attributed to habit, environment, idiosyncrasy, caprice, or infirmities of age as to mental disorder. That he was enfeebled by age during the latter months of his life there can be little doubt. No substantial evidence, however, tending to establish settled insanity or dementia or insane delusions or hallucinations on the part of the testator was adduced. There is absolutely nothing in his relations with his son, whom he visited in 1915 with the intention of remaining a member of his household, that would in anywise support the theory that the testator in concluding that he was not welcome, or at least that he would not be satisfied to remain with his son, was moved in so concluding by an insane delusion or hallucination. He made a trip across the continent on his own initiative to his son's home, investigated the situation, and decided that he would spend the remainder of his days in California. We have read the son's testimony describing the father's visit to him and it contains nothing that would support an inference that he was mentally unsound. [1] Proof of the existence of hallucinations or delusions is not alone sufficient to annul a

will unless such hallucinations or delusions bear directly upon the testamentary act. (*Estate of Shay,* 196 Cal. 355 [237 Pac. 1079] ; *Estate of Presho,* 196 Cal. 639 [238 Pac. 944] ; *Estate of Gunther,* 199 Cal. 119 [248 Pac. 514] ; *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45] ; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932].)

Tested by a long list of decisions of this court the evidence in the instant case must be held to be insufficient as a matter of law to establish testamentary incapacity. Almost every act upon which contestant relies to establish incompetency has been considered by this court and its evidentiary weakness judicially pointed out. The opinions expressed by said witnesses founded upon facts and conditions described by them are not sufficient to overturn the uncontradicted evidence of the witnesses who testified to testator's sound mental condition at the very time the will was executed or at times very near thereto. [2] As has been said by this court in many decisions the question to be determined is not what might have been the mental condition of the testator, but what in fact was his mental condition at the time he made the will. (*Estate of Perkins, supra; Estate of Relph,* 192 Cal. 451 [221 Pac. 361] ; *Estate of Wilson,* 117 Cal. 262 [49 Pac. 172, 711].) [3] The law presumes that the subscribing witnesses to the execution of a will had their attention drawn to and noted the mental capacity of the testator. The opinions of such witnesses are entitled to more weight than that of one who is merely passive. (*Estate of Holloway,* 195 Cal. 711 [235 Pac. 1012].) Besides the subscribing witnesses there was also present the pastor and spiritual adviser of testator. No one attempted to question the honesty or standing of said witnesses and no impeachment of their testimony was attempted. Paraphrasing the language in *Estate of Carson,* 74 Cal. App. 48 [239 Pac. 364], it may be said here, as it was said with respect to the testator in that case, that McDonough was able to and did keep in mind all things necessary to qualify him to make a will and was, as shown by the only evidence given as to his mental condition at the very time the will was made, free and able to act in its execution. A *résumé* of the testimony of those present at the time the will was made and as to which there is no direct contradiction, if indeed there can be said to be any evidence to show mental incompetency, follows:

The Reverend Timothy Galvin, while not a subscribing witness to the will, was present at the time of its execution. He first met Christopher McDonough in July, 1922, and he saw him frequently until the day of his death, June 5, 1924. He visited him in the capacity of spiritual adviser at the residence of Mr. and Mrs. Joyce, and his relations with him were of an intimate character. From the first time he met him to the day he made the will—a period of about two months—he saw him five or six times. Thereafter he saw him at least once, and frequently twice, monthly. During the entire period of his acquaintance he never knew of his doing an unusual or unreasonable act or heard him say an unreasonable thing. He gave intelligent answers to questions asked him and understood what he was doing and had the free use of his will power. He was cheerful at all times, and was always glad to see him and upon his departure invited him to return. At the time the will was executed there were present in the room at Mr. and Mrs. Joyce's residence Theodore Savage, Denis O'Shea, Mr. McDonough, and himself. The will was drawn and subsequently read to the testator in the presence of the persons above mentioned and Mr. McDonough was asked by Mr. Savage if he was satisfied with it and if it was his last will. He saw the testator sign it by affixing his mark to it and he saw the witnesses sign it as such. Some time in July the testator told Reverend Galvin that Mrs. Joyce had taken him in and had been very good to him and she intended to keep and care for him during the remainder of his life. He said he had some money and wished to leave it to her upon his demise. In a second conversation that took place about the first of August, four weeks before the testator executed the will, he repeated what he had previously said as to the kind treatment he had received at the hands of Mrs. Joyce and stated that it was his intention to leave to her the money he had on deposit with the Hibernia Savings and Loan Society. He also spoke of a business transaction he had with the Hibernia Savings and Loan Society that was not entirely satisfactory to him. The witness advised him to secure the services of a lawyer if he wished to make his will or transact important legal business. The witness informed Mrs. Joyce that the testator desired a lawyer to draft his will. The testator spoke of his family affairs and said he had a son in one of the eastern states—

the witness did not remember the particular state—but he did not want anything to do with him as he had visited him some years previous and received a poor welcome at his hands; that, in fact, his son "refused to give him a dinner; that he called one day and left on the next train." The testator did not appear to be more than seventy-five years of age and did not seem to be feeble for a man of his years. In fact, he appeared well. He did not complain of suffering from any ailment.

Denis O'Shea, a neighborhood merchant, was one of the witnesses to the execution of the will. He first became acquainted with the testator in 1919 and knew him intimately from the time he came to live with the Joyce family until his death, June 5, 1924. He had many conversations with him on various topics and had ample opportunity to observe him. There was nothing peculiar or unusual in his conversation or conduct at any of the times he met him and he appeared at all times to be perfectly sane. He used a stick or cane when walking and said that he had bad feet and could not trust himself on the hillsides. The Joyce home was in a hilly section of the city. He did not appear feeble or infirm, but was quite strong for a man of his age. The witness detailed a conversation he had with the testator on the increase of the cost of living above the ruling market prices of former years in which he gave concrete illustrations of the shrinkage in the purchasing value of money within his experience which would clearly indicate that he was well oriented as to the subject of the conversation. Other subjects were discussed and no diseased mental condition or mental fault was observed in the testator at any of the times the witness was thrown into contact with him. The witness was called to the Joyce home on August 29th by Mrs. Joyce to witness the testator's will. When he arrived the only persons he saw in the house were Father Galvin, Mr. Joyce and Mr. McDonough. Mr. Savage and Mrs. Joyce came afterward. The attorney excluded everyone from Mr. McDonough's room, closed the door, and spent some time with Mr. McDonough without the hearing or presence of any other person. Mr. Savage finally came out of the room and proceeded to write the will. Upon completing it he called the witness and Reverend Galvin into the room, where Mr. McDonough was sitting in a chair, and closed the door. Neither Mr.

Joyce nor Mrs. Joyce were in the room. Mr. Savage read the will over twice and asked the testator if he knew what the paper was and the testator replied that it was his will. He then signed it with a cross. The testator requested the witness to sign it and he complied with the request. Mr. Savage also signed as a witness.

Theodore J. Savage, an attorney who has practiced his profession for thirty years in San Francisco, testified that he drew the will under the instructions of the testator. A day or two before the will was drawn Mrs. Joyce, who was a total stranger to him, came to his office and stated that an old gentleman stopping at her house wished to make his will. She brought with her a card from Dr. George T. Brady, an acquaintance and an occasional client of the attorney. The attorney told Mrs. Joyce that he would be at the house either on the next or second day at a fixed hour and instructed her to have present two persons who were acquainted with Mr. McDonough to serve as witnesses to the execution of the will. Upon his arrival he found Father Galvin and Mr. O'Shea there. He was introduced to McDonough, who was fully dressed and seated in a chair. He talked with him at considerable length and, after taking his instructions in detail, went into the dining-room, from which all persons withdrew at his request, and he there drew the will which is assailed by contestant. He read the will aloud to the testator in the hearing of those present and discussed some of its provisions with him. The testator said he could neither read nor write and requested that the will be read a second time. He asked the attorney to write his name at the place where he was to affix his mark, declared the instrument to be his will, made his mark, and requested the attorney and Mr. O'Shea to sign as witnesses to its execution. The attorney testified that in his opinion the testator was perfectly sane in mind at the time he made his will, his reasons therefor being founded upon the conversation held with him for the purpose of obtaining necessary information to prepare the will. He asked the testator many questions which tested in a large degree his testamentary capacity. The testator stated that he was born in Ireland, and was seventy-eight years of age, and he talked generally about the different places he had visited in this country. He said the only property he owned was about eight thousand dollars deposited

with the Hibernia Savings and Loan Society. Upon inquiry as to his family history, the testator said he had been separated from his family for a great many years and had no communication with any member. He said he had a son named Daniel, residing in the east; that he visited him some seven or eight years prior with the intention of remaining, but he was not welcome and so came back to California. He stated that he was the father of other children, but that Daniel told him all the other children were deceased and that he did not know whether the issue of any deceased child was living. He wished to leave Father Galvin one hundred dollars to celebrate masses for the repose of his soul and the balance he wished to leave to Mrs. Joyce, as he and the Joyces had been friends for a long time. Mr. Savage inquired as to his health and the testator said he was all right except his feet and legs bothered him a great deal and he could not get around as well as he should. When asked by the attorney if he wanted him to draw his will, his reply was that he did. His appearance was good and he seemed bright and intelligent. There was nothing in his appearance to indicate that he was otherwise than perfectly competent to make a will. Asked if he had a place of deposit for his will, he said he once had a safe-deposit box but had surrendered it. The attorney informed him that he had a safe at his office and if he wished he would keep the will in his office and upon his death he would file it at the proper time with the county clerk. McDonough said that was very good and requested the attorney to preserve the will and file it at the proper time. The attorney gave him his professional card and told him that if he should thereafter desire to make any change in his will to call him up and he would come to him and make any change or changes which he might desire to make.

Dr. Thomas H. O'Connor was called to attend the testator during the latter days of August, 1922, close to the day on which the will was executed. The testator was at that time suffering from an eczemic condition in his lower limbs. He was able to walk about and there was nothing to indicate feebleness in his condition. His body was neither emaciated nor poorly nourished. The physician was of the opinion that the testator was of sound mind. Six months thereafter the physician was again called to attend him on account of

a cold he had contracted.  He found McDonough's condition about the same as upon his previous visit.  His arterial system then was, as no doubt the fact is with a vast majority of aged persons, in a condition of hardening.  The testator, however, lived for more than a year thereafter and was frequently seen by neighbors and others upon the sidewalk and about the premises, and he appeared to be rational in both conversation and conduct.  After the death of the testator the witness prepared the medical certificate of death wherein the cause of death was stated to be cerebral hemorrhage and the contributory cause arteriosclerosis.  The physician testified in this connection that death was instantaneous upon the occurrence of the hemorrhage.  Medical testimony was offered to establish as a fact that hardening of the arteries is common to most persons who have passed middle life.  This knowledge is common to the laity.  It is nature's inevitable law and marks the beginning of the disintegration of the human body.  [4]  It by no means follows, however, that testamentary capacity ceases with the approach of or even with the most advanced stages of arterial hardening.  This condition or stage in life is but partial evidence to be considered in connection with other evidence in determining whether or not arteriosclerosis has shut off the blood supply to the brain to the extent that the mind is unable to correctly function.  Any other theory would deprive almost every person who has passed middle life of the right to dispose of his estate by will.  We have epitomized the testimony of the four witnesses, three of whom were present at the exact time the will was executed, two being subscribing witnesses, to show the testamentary competency of decedent at the period of time which the law regards as being of prime importance in this class of cases.  Two of these witnesses were intimate acquaintances and testified to the sound and disposing mind of the testator not only at the time the will was executed but at other times very near to the day the will was executed, both prior and subsequent thereto.  As to the other two, one was his physician who had attended him but a few days before he executed the will, and the other was an attorney whose first duty to his profession required him to satisfy himself that the testator was fully competent to make a will before engaging in an act which possessed the potentials of excluding heirs from their

inheritances. Besides the testimony of the spiritual adviser, the lawyer and the layman who were present at the time the will was executed, which was not contradicted by direct evidence, other witnesses, four of whom seemed to have had no pecuniary interest in the result of the trial, gave testimony as to testator's mental soundness at the very time the will was made as well as at other periods of time both near to and remote from the day in question. John J. Matthew's acquaintance with the testator covered a period of seventeen years. After the testator came to reside at the Joyce home he saw him at least once, and sometimes twice, a month. His testimony was that he was bright and intelligent, seemed clear in mind and exhibited no peculiarities of conversation or conduct at any time. Miss Mary Ryan saw him while he was at the Joyce home at least once a week, conversed with him frequently, and pronounced him to be perfectly sane. Elizabeth Craig, a pupil attending the city public schools and a recent arrival from Ireland, the birthplace of herself and McDonough, visited the Joyce children practically every day and conversed with McDonough almost daily from the time he came to the Joyce home until his last illness. In her opinion he was perfectly sane.

Mr. and Mrs. Joyce both testified at length as to the circumstances under which McDonough came to live in their family. Mr. Joyce had known McDonough for many years prior to his marriage and the latter visited at the family home after said marriage. Mrs. Joyce was exceptionally kind to him during all the time he was at her home and cared for him tenderly during his last illness, which was somewhat protracted. McDonough was greatly pleased with the care and treatment he was receiving and expressed gratitude for the comforts of real home life. Both testified as to his competency.

Two medical witnesses were called in the case, one by the contestant and the other by the proponent. In response to a hypothetical question embracing substantially the same assumed statement of facts, one was of the opinion that the testator was of unsound mind and the other was of the opinion that he was mentally sound.

The fact that McDonough, beginning some time after he made his will, paid one hundred dollars monthly for the board, lodging, and care which he received is not pertinent

to the issue of his competency to make a will. The amount, however, was not unreasonable, under the circumstances of the case.

Contestant has quoted at considerable length from *Dunphy* v. *Dunphy*, 161 Cal. 380 [Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512]. That case considered the question as to the degree of unsoundness of mind that must be proved to authorize a judgment annulling a marriage contract. We are not here considering the mental capacity requisite to make a valid marriage contract, which presupposes an understanding on the part of the contracting parties of the duties, obligations, and responsibilities of the marital state. Here we are considering merely the ability of the testator to make a simple will. The capacity requisite to do so has been repeatedly defined by decisions of this court and it is not necessary to cite specific cases. [5] In considering the question of a testator's competency the rule by which the evidence must be measured is thus stated: " . . . the issue does not rest upon the contestant's evidence alone. The testimony of proponent's witnesses must be taken into consideration in weighing the sufficiency of the contestant's case. Evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence." (*Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085].)

[6] Measured by the law of this state the evidence must be held to be insufficient to sustain the judgment.

The judgment is reversed.

Richards, J., Shenk, J., Waste, C. J., Curtis, J., and Sullivan, J., concurred.