[Civ. No. 6939.  First Appellate District, Division Two.—August 20, 1929.]

In the Matter of the Estate of ALFRED C. CLARK, Deceased.  F. W. DOBBEL, Appellant, v. OLIVER L. REARDON, Respondent.

A. R. Grinstead and Clarendon W. Anderson for Appellant.

Barrett & McConnell for Respondent.

NOURSE, J.—This is an appeal from the judgment of the Superior Court rendered upon a verdict of the jury denying probate of the will of Alfred C. Clark. The appeal is presented on typewritten transcripts.

Alfred C. Clark died on March 11, 1926, at the age of seventy years. He left surviving him as his only heir at law his sister Elizabeth Clark Wiley, who was the contestant in the trial court. Subsequent to the trial this contestant died and her administrator has been substituted as party respondent herein.

The decedent's family moved to Sonoma County in the year 1875 and settled upon a ranch near Glen Ellen. From 1875 to 1898, when the decedent's father died, the decedent

worked with his father on the ranch and in 1898 decedent married and continued to reside with his wife upon the ranch and to farm the same. In 1913 the decedent obtained a divorce from his wife upon the ground of her desertion. He married again in 1916 and his second wife died in 1924. The contestant lived in the same household with decedent until their father's death, when the contestant moved to another house near by, where she continued to live until her marriage in 1909, when she moved to Ventura County. For many years prior to his death the decedent and contestant were estranged because of controversies arising out of the settlement of the estate of their father and of a brother named George Clark, who died in 1920. The original ranch property had been divided and other properties acquired so that about the time of the father's death and until the death of the brother George the decedent, in addition to taking care of his own property and of the interest of the contestant, managed and farmed the property belonging to the brother George. George's property went to the decedent and the contestant and this was subsequently sold by the decedent and the proceeds divided. Prior to the sale of this property the decedent wrote to contestant stating that he could obtain fifteen or sixteen thousand dollars for it and the contestant agreed to accept eight thousand dollars as her share and sent a deed conveying her interest. The property, however, was sold for twenty-five thousand dollars and the decedent insisted upon holding the contestant to her bargain, sending her eight thousand dollars from the proceeds and investing the rest on his own behalf. This occurred in the latter part of 1920 and from that time until decedent's death the parties drifted apart and during the last three years of decedent's life they did not see each other at all. The will was executed on March 10, 1926, while the decedent was sick in the hospital suffering from hypostatic pneumonia, from which he passed away on the day following. This controversy is referred to as explaining in a measure the decedent's act in omitting to provide for his sister in his will. The testimony regarding this controversy no doubt bore an important part on the jury's verdict in favor of the sister and though it has little bearing upon the real issues tried, it should be noted that the jury heard the contestant's side of the controversy only.

■ The attack upon the will was based upon the grounds that it was not executed in the manner and form required by law; that the decedent was not of sound or disposing mind or memory and that he was suffering from insane delusions in that he stated that the contestant was possessed of sufficient property and means for her own support and that she was a religious fanatic and that he feared that any property he might leave her would be contributed by her to religious purposes. At the close of contestant's case the trial judge granted a nonsuit on the issue of the improper execution of the will and the other two issues were submitted to the jury. On these the jury answered that the decedent was not of sound and disposing mind at the time the will was executed and that he was at the time suffering from insane delusions. On this appeal the attack upon the judgment is based upon the ground that the evidence is not sufficient to support the verdict in either particular. The evidence on the part of the contestant rested upon her testimony and that of four elderly women who related numerous idiosyncracies and peculiarities of the decedent generally, running over a period of ten to twenty years prior to the date of the execution of the will. In addition to this, three medical experts were called and in answer to a hypothetical question which had been prepared in advance for them by the contestant they answered that in their opinion the deceased was of unsound mind at the time of the execution of the will. Another witness called by the contestant, the cashier of the bank where the decedent transacted his business, testified as to matters relating to the decedent's account in the bank, but when asked upon cross-examination his opinion as to the mental capacity of the decedent the contestant objected and he was prevented from answering. On the part of the proponent testimony was given by the two subscribing witnesses to the will, by the physician and the nurse who were in constant attendance upon him in his last illness, by his family physician, and by many friends and neighbors who testified unqualifiedly that the decedent was of sound mind. Having reviewed all this testimony we are satisfied that the evidence does not support the jury's finding of unsoundness of mind or that the decedent was suffering from an insane delusion and for these reasons the judgment must be reversed, but in conformity to the practice in cases of this kind we will

include a *résumé* of this testimony in order that those who wish may read.

█ Before discussing the testimony it is well to refer to the rules of law governing a case of this character. For this purpose we cannot improve upon the statement of the Supreme Court in *Estate of Sexton,* 199 Cal. 759, 764 [251 Pac. 778, 780], as follows: "A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. (*Estate of Motz* (136 Cal. 558 [69 Pac. 294]), *supra; Estate of Dole,* 147 Cal. 188 [81 Pac. 534]; *Estate of Huston,* 163 Cal. 166 [124 Pac. 852]; *Estate of De Laveaga,* 165 Cal. 607 [133 Pac. 307]; *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085].) █ The actual mental condition of the testator *at the time of the execution of the will* is the question to be determined. (*Estate of Perkins,* 195 Cal. 699 [235 Pac. 45]; 26 Cal. Jur. 635.) Evidence as to mental condition before and after the execution of the will may be relevant and admissible, but it is important only in so far as it tends to show mental condition at the time of executing the testamentary document."

█ In emphasizing the degree of mental unsoundness sufficient to destroy testamentary capacity, we quote from page 765 of the same case, as follows: " 'Insanity' is a broad, comprehensive and generic term of ambiguous import. In a medical sense it is used to denote any unsound and deranged conditions of the mind, and every degree of mental unsoundness, whatever may be its source or cause. (32 Corpus Juris, 594.) But mere proof of mental derangement, or of insanity in a medical sense, is not sufficient to invalidate a will. Not every degree of mental unsoundness or mental weakness will suffice to destroy testamentary capacity. The contestant is required to go further than that. He must either show such a complete mental derangement as denotes utter incapacity to know and to understand those things which a testator must be able to know and to understand in order to possess testamentary capacity, or he must show the existence of a specific insane delusion which

affected the making of the will in question. (*Estate of Shay,* 196 Cal. 355 [237 Pac. 1079].) In other words, mental derangement sufficient to invalidate a will must be an unsoundness of mind in one of two forms: (1) mental unsoundness of such broad character as to establish incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. And even in the latter class of cases it is not sufficient merely to establish that the testator was the victim of some hallucination or delusion; it must be shown that the will was the offspring of the hallucination or delusion. (*Estate of Perkins, supra.*)

■ "Testamentary capacity is always presumed to exist until the contrary is established. That is to say, the presumption is always that a person is sane, and the burden is always upon the contestant to show affirmatively and by a preponderance of evidence that the testator, at the time of executing the will, was of unsound mind. (*In re Wilson,* 117 Cal. 262 [49 Pac. 172, 711]; *Estate of Perkins, supra;* 26 Cal. Jur. 756.)"

Applying these principles of law to the facts of the case here it is evident that the testimony is insufficient to support the attack upon the will. The only direct evidence of facts existing when the instrument was executed is that which was given by witnesses for the proponent and this testimony was clear, direct and positive evidence that the testator was of sound and disposing mind at the time the will was executed. During the winter preceding his death the decedent lived with Mr. and Mrs. Johnson, who were neighbors, until March 2, 1926, when he returned to his own farm where he immediately contracted a severe cold and on March 5th was removed to a hospital. Mrs. Berger, a witness called by the contestant, testified that she had known the decedent since 1907 and that she had visited in his home frequently since his marriage to his second wife in 1918; that when she learned that decedent was ill on March 2, 1926, she went to his home and nursed and cared for him for three days and until he was removed to the hospital. Through all this acquaintance she was unable to testify to any act indicating unsoundness of mind, but when asked this question she insisted that the decedent was of sound mind; that when he left his home for the hospital his mind

was perfectly clear "up to that time." Mrs. Burns, one of the subscribing witnesses to the will, and the proprietor of the hospital in which he died, testified that he did not have delirium at any time during the time which he spent in the hospital; that prior to the execution of the will he had talked with her of his desire to make a will and had told her that he was not going to leave anything to his sister because she was well provided for and also because she was a religious fanatic; that after the will was signed by the decedent he declared it to be his last will and personally requested Mr. Grinstead and herself to sign as subscribing witnesses; that after this was done he said "This is my will now and I feel relieved"; that thereafter the decedent asked the witness if she did not desire some money for his expenses in the hospital, saying, "I had better draw you up a check. I might pass out. Life is not certain." Soon thereafter Mr. Dobbel, the proponent, came in and the decedent asked him to write out a check for the hospital, which was done and the decedent signed the check. This witness further testified that after the will had been executed the decedent appeared to be very much better and very much encouraged, felt that he would recover. Mr. Grinstead, an attorney at law practicing in the town of Sonoma, was the other subscribing witness to the will. He testified, as did Mrs. Burns, that at the time the will was executed the testator was of sound and disposing memory. This witness testified that he had not known the testator until called to the hospital on the day previous to the execution of the will. That all the information relating to the property, the beneficiaries under the will and the amounts to be given each was furnished to him by the testator at the time the will was prepared. The will was written by this witness at the bedside as dictated to him by the testator. The evidence is unmistakable that none of those witnessing the execution of the will and none of those in attendance upon the decedent during his last illness had used any influence of any character as to the disposition of the property, but on the other hand all the names of the beneficiaries and addresses and the descriptions of the property, both real and personal, were given to Mr. Grinstead by the testator from memory and without reference to notes or other suggestion. Dr. McGrath, who attended the deceased in his last illness, testi-

fied that his death was caused by hypostatic pneumonia, which he explained is not the disease usually called pneumonia by laymen, but is a cardiac condition diagnosed as heart trouble; that during this illness the patient does not suffer from delirium and that during all the time he was treating the deceased from March 5th to March 10th he was entirely rational and of sound mind. This witness further testified that during this period the testator frequently mentioned his desire to make a will and asked the witness to summon an attorney for that purpose. Miss Munzenmier, who was one of the testator's nurses in the hospital, testified that he frequently spoke to her about his desire to make a will; that during his entire sickness he talked rationally and was in his right mind; that he was never delirious at any time while she was attending him and that he talked with others who visited him about his plans to make a will. Dr. Meneary, who had been the personal physician of the decedent for many years, testified that he had frequently visited at the home of the decedent and that the latter had frequently called at his office. From this professional observation of the personal conduct and life of the deceased this doctor testified that he was of sound mind and that any question of his being of unsound mind had never occurred to him. None of these witnesses, except Miss Munzenmier, the nurse, to whom a small gift was made, was a beneficiary under the will, and the attorney who drew the will had not known the testator before he was called in for that purpose, and knew none of the beneficiaries. Other witnesses whom we do not need to give by name, friends and neighbors of the testator, men who had been engaged in business with him and who had traveled with him, testified as to his mental soundness with one accord. And in this connection it may be well to point out that with the exception of the three medical experts, all the witnesses called by the contestant were elderly women who professed warm friendship for the contestant and a desire to see her successful in the contest and who for some reason had been offended by the deceased during his lifetime. One of these witnesses was his former wife whom he divorced thirteen years prior to the date of the execution of the will. Her entire testimony related to instances occurring during their married life. Another of these witnesses had not seen the decedent since 1917 and

all her testimony related to instances occurring prior to that time. Another witness had known the deceased since 1907 and called upon him just prior to his death. This witness, while expressing dislike for some of the legatees under the will and frankly admitting that she would like to see the contestant have the property, emphatically declared that he was of sound mind up until the time he went to the hospital on March 5, 1926. Another witness had known the deceased prior to the year 1916 and related some instances that occurred during their life as neighbors. She saw the decedent once after that time in October, 1925, when she met him in San Francisco. What impressed upon her at that time that he was of unsound mind was the fact that he had forgotten a little fire which had occurred in one of the rooms of the house in the year 1915. These witnesses stressed the fact that they reached the conclusion that the decedent was of unsound mind because he did not engage with them in discussion of politics or current affairs and did not read the books and magazines that they were interested in but preferred the reading of the "Youth's Companion." These witnesses, particularly his former wife, related instances of the decedent's physical habits and custom of telling vulgar stories and using vulgar language, a practice which he seems to have discontinued after his marriage to his second wife in 1916. It is significant that none of the men acquaintances or neighbors of decedent were called by the contestant and that all the male associates of the decedent who were called by the proponent testified to his soundness of mind.

To our minds the evidence which is the most convincing on the general question of mental soundness is found in the testimony of Mrs. Weaver, a sister of the deceased's second wife, during which there was received in evidence a number of letters written by the decedent to Mrs. Weaver at her home in Seabright, Santa Cruz County, from a time subsequent to the death of his second wife in 1924 down to a few months prior to the date of the execution of the will. In view of the fact that the contestant emphasized the lack of education of the testator, that he had been compelled to drop out of school at the age of twelve years because of inability to learn, that his entire source of reading was the "Youth's Companion," and that he would never discuss or take any interest in politics or current affairs, these let-

ters written as they were a short time prior to the date of the execution of the will are potent evidence of the keenness of the testator's mind and of his interest in current events during the latter term of his years. The testator and his sister-in-law, Mrs. Weaver, had each purchased shares of stock in a mining corporation operating in Nevada, and as favorable reports came to them from time to time covering the operations of the mine they were led to look hopefully to the success of their investment. These investments are referred to throughout this correspondence and the anticipations of the testator for a financial gain are all expressed with a desire that he may have funds to give to others. This attitude on the part of the testator is explained by the testimony of the contestant that throughout his life he was in the habit of giving money and property to those whom he believed to be in poorer circumstances than himself, and that he frequently expressed the wish that he could help others who were in financial straits, and that a large proportion of the property and moneys which he had acquired had been given away to others rather than dissipated by himself. The first letter in the record is dated January 18, 1925, which we quote in full:

"My dear sister Dell: Yours with Saw's Letter received. Many thanks for sending it. It surely looks good. I sincerely pray it may prove as good as it looks. Please thank them for the extra shares for me. There are so many who I want to help in their struggle to meet the obligations of this life that the money can't come amiss. And when it comes, it will be put where it will do the most good. Please send my shares to me here, and I will put them in my box at Santa Rosa. You surely won't send anymore than you already have. When they begin paying dividends people will be speaking of you as that *rich lady*. Then look out for the *men*.

"You will have enough for yourself and Roscoe too. I shall have *others* to look after. God knows there are many who need lifting along in their struggle for existence. The more I can help the happier I will be. I pray that as they go deeper, the lead will turn to silver and then to pure gold. You had better send certificate by express, or the same way they were sent to you to me, to me to Glen Ellen. Of course,

if they should be stolen, they would not be worth anything to anyone else except me.

"Now sit up and be happy and pray for the best.

"Yours with best wishes always,

"Love to all, Dell, Rosco & Ann, FRED."

Eleven similar letters are found written at intervals of about four weeks, the last appearing in the record being dated January 31, 1926, which was less than two months prior to the execution of the will. This letter reads in part as follows:

"Leva's passing surely was sudden, although I was not surprised to hear that she had gone, as her condition for several years has been that of a consumptive. I have never heard one word from her since seeing her at Susie's funeral. I think she expected Susie (testator's second wife) to leave her something, but why she should expect anything I can't understand. . . .

"I am here with the Johnsons & shall stay until March or April, then go back to Rose Cottage & stay until I can rent or sell the place. I don't feel that I can ever make my home there again. The Sullivans are living on their place & fixing up the house & think they are improving the place, but the more they do the worse it looks. *No taste for the beautiful.* The Johnsons are just about on the standstill as far as making a living goes. I don't know how they could have held on, if I had not come here and stayed this winter. I not only pay my board, but help them with their work also. (The Johnsons were both remembered in the will.) We are having heavy rains now, which were very much needed. How did things look at the mines when you were there. Have they started building the smelter yet? Give them all my love when you write again. Also remember me to the kids & write soon. Am so sorry about the Sweet Shop friends.

"Give my regards to all my acquaintances down there. Maybe I will drive down next summer on my way to Fallon.

"Well, I must close,

"Yours with love,

"FRED."

We have read all this correspondence. It appears without material error in spelling, punctuation, grammar or com-

position. If this is the character of education that a man obtains from reading the "Youth's Companion" that magazine might well be placed in every American home. If this correspondence had been included in the hypothetical questions propounded to the medical experts and in the face of this evidence they had expressed the opinion that the testator was of unsound mind then we would say that the practice of employing experts of this character is a useless and frivolous thing. If this evidence does not demonstrate the soundness of mind of the testator for a period of one year at least preceding the execution of the will it does at least demonstrate that he had lucid and normal periods and that· at a time less than two months before the execution of the will he was enjoying one of those normal states of mind. There was not a particle of testimony offered or received on the part of contestant even remotely tending to prove an irrational or abnormal condition of mind between this period and the date of the execution of the will. In fact, all the competent testimony of facts covered matters which occurred over a period of from ten to twenty years prior to that date. Aside from the testimony of the experts and the testimony covering the issue of insane delusions, both of which we will treat later, there is no evidence in the record which is sufficient as a matter of law to overcome the direct and positive evidence of mental competency existing at the time of the execution of the will or to rebut the presumption of sanity which runs to every man, even though he make a will which omits to provide for an heir at law.

The rules of law covering cases of this kind are well settled. Some of the later cases are *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45]; *Estate of Shay,* 196 Cal. 355 [237 Pac. 1079]; *Estate of Relph,* 192 Cal. 451 [221 Pac. 361]; *Estate of Gunther,* 199 Cal. 119 [248 Pac. 514]; *Estate of McDonough,* 200 Cal. 57 [251 Pac. 916]; *Estate of Haupt,* 200 Cal. 147 [252 Pac. 597]; *Estate of Smith,* 200 Cal. 152 [252 Pac. 325]; *Estate of Johnson,* 200 Cal. 299 [252 Pac. 1049]; *Estate of Phillips,* 202 Cal. 490 [261 Pac. 709]. Almost every fact upon which contestant relies to establish incompetency in this case has been considered by the Supreme Court in the cases cited, and its evidentiary weakness has been judicially pointed out. The insufficiency of the evidence such as we have here coming from the contestant

herself showing that in his early life the testator was peculiar at times and did unreasonable things, but that throughout her acquaintance with him her brother had many normal and rational periods, and that since his second marriage in 1916 the influence of his second wife was such that the testator's condition was markedly improved, and that she, the contestant, was always satisfied to let her brother manage her property and account to her for the income and proceeds thereof, renders appropriate the following language from *Estate of Smith,* 200 Cal., at page 159, *supra:* "Disregarding any conflicting evidence and resolving whatever conflicts there may be in the evidence in favor of and granting to the contestant every possible inference to be drawn from the evidence, there still remains a hiatus in the chain of proof that at the time of the execution of the will the testator was mentally incompetent or that he was at the time subject to delusions which in any manner affected his testamentary act." Bearing in mind the issue to be determined is not what might have been the mental condition of the testator but what in fact was his mental condition at the time he made the will (*Estate of Perkins, supra; Estate of Relph, supra; Estate of Wilson,* 117 Cal. 262 [49 Pac. 172, 711]), we are satisfied that the opinion expressed by contestant's witnesses founded upon facts and conditions existing long prior to the date of the execution of the will "are not sufficient to overturn the uncontradicted evidence of the witnesses who testified to testator's sound mental condition at the very time the will was executed or at times very near thereto." (*Estate of McDonough,* 200 Cal. 57, 62 [251 Pac. 916, 918].) But as said later on in the same case (page 69) " ' . . . the issue does not rest upon the contestant's evidence alone. The testimony of proponent's witnesses must be taken into consideration in weighing the sufficiency of the contestant's case. Evidence which, standing by itself, might be sufficient to sustain the verdict, may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence.' (*Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085].) "

The argument is made that the testator was possessed of insane delusions in the belief that his sister was well provided for, that she had as much property as he had and

that she was a religious fanatic and that if any of his property were left to her she would devote it to religious purposes. The proved facts are that the sister owned two houses in the town of Fillmore, that her husband owned six houses in the same town, and that their combined income at the time of the trial was about $145 per month. At the time of the execution of the will the contestant was about seventy-five years of age and her husband was of about the same age. They had no one dependent upon them for support, and the only near relative was a grown son of the husband by a former marriage. The income from the combined properties of the contestant and her husband was low at the time due to poor business conditions in the town, but at that it was greater than that received by the testator from his property. He naturally viewed the possession of eight houses as property of some value, and, therefore, had justification in the belief that his sister was provided for and that her property, because of the income she was able to receive from it, was as valuable as his. He had frequently expressed the wish that his sister, who was five years his senior, would pass away before he did, so that he could direct the disposition of his own property. He had also expressed the fear that if he should die before his sister and leave his property to her she would dispose of it in a way other than desired by him, and that because of her advanced age any property which he left to her would be of little or no benefit to her. The testator's fear that his sister would not long outlive him was borne out by the fact that subsequent to the trial on October 14, 1926, she passed away. The asserted insane delusion that the sister was a religious fanatic is a matter which cannot be determined upon any basis of fact or reason, because the belief of religious fanaticism depends entirely upon the attitude of the believer as to what form of religious enthusiasm is reasonable and what is fanatical. Here the contestant testified that she had always been greatly interested in the Methodist Church and in Sunday-school work and was "enthusiastic" over religious affairs and church affairs; "that is my principal work in life and I had no other interest in Glen Ellen except that." On the other hand, the testator had given expression of his enthusiasm along these lines in the work of the Masonic order and had often

expressed the desire that the home place should be turned over to the local Masonic lodge upon his death and had expressed the fear that if he left it to his sister she would turn it over to one of her church activities.

Mistaken though he may have been as to his belief in his sister's financial condition, there was nevertheless some basis for the belief and his judgment as to what his sister needed in a financial way is not to be supplanted by the judgment of the jury or of the court upon that matter. And it is of no moment that the court or jury take a different view as to the reasonableness of his prejudice or dislike of his sister's religious activities or that in the opinion of the court or jury the testator's property would have gone to a better purpose if the contestant had been allowed to devote it to the aid of the church contrary to the wishes of the testator. That beliefs of this character, unreasonable though they be, but founded upon some fact or information which may or may not be true, do not amount to insane delusions sufficient in themselves to overcome the presumption of soundness of mind seems abundantly clear from all the cases on the subject. What is necessary in a case of this kind is stated in *Estate of Gunther,* 199 Cal. 119, 125 [248 Pac. 514, 516], from which we quote: "An insane delusion is not only one which is error but one in favor of the truth of which there is not only no evidence, but regarding which there is the clearest evidence to the contrary. It is a delusion or conception which springs up spontaneously in the mind of a testator and is not the result of his belief or knowledge of any fact which would in reason or in probability furnish evidence in its support. The law upon this subject has been very fully and ably set forth in *Estate of Scott,* 128 Cal. 57 [60 Pac. 527]; *Estate of Allen,* 177 Cal. 668 [171 Pac. 686]; *Estate of Russell,* 189 Cal. 759 [210 Pac. 249]; *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45]; *Estate of Shay,* 196 Cal. 355 [237 Pac. 1079], and cases cited."

A word should be said concerning the testimony of the three expert witnesses called by the contestant. These witnesses, in answer to a hypothetical question prepared by the contestant and submitted to them before their examination, all agreed to give their opinion, based upon the facts covered by this question, that the testator was of

unsound mind at the time of making his will. The appellant attacks this testimony upon several grounds, but mainly because the question does not conform to the facts proved. This objection is unanswerable. These witnesses based their answer upon a statement of facts which, besides being directly contrary to the facts proved, omitted many essential elements in the history of the testator's life which were then before the jury and conceded to be true. For the purpose of this opinion it is necessary to refer to but a few of these discrepancies. The hypothetical question included the statement that the testator took no interest in current affairs and read only boys' stories found in the "Youth's Companion." These statements were both untrue. It included a statement that the testator died from pneumonia with the implication that his last illness was accompanied by the usual delirium. This also was untrue. It included a statement of the making of the last will without including any of the circumstances surrounding this transaction, circumstances which were of the most vital importance to enable anyone, a medical expert or a layman, to reach a conclusion as to the mental capacity of the testator at the very time the will was executed. Thus the question omitted the conceded fact that during the entire time of his last illness the testator suffered no delirium, but was fully conscious of all the facts surrounding him; that he frequently stated to the nurse and others about him that he desired to make a will; that all the items of the will including the descriptions of his properties, names and addresses of the beneficiaries, some of whom lived out of the state, were given voluntarily by the testator without reference to any note or memorandum; that none of those present when the will was drafted used any influence upon the testator; and that after the will was executed he expressed great satisfaction that that act had been performed and that he felt better because of it. There was also omitted from the question any mention of the numerous letters which the testator addressed to his sister-in-law covering a period of more than one year preceding the date of the execution of the will and all of which displayed a keen interest in current events and an unmistakable ability on the part of the writer to comprehend the daily affairs of life. It is unnecessary to further detail discrepancies in this hypotheti-

cal question. Manifestly the answers of the three experts must have had some effect on the minds of the jury and because of the error in this respect, if for no other reason, the judgment must be reversed. (*Estate of Gould,* 188 Cal. 353 [205 Pac. 457]; *Snow* v. *Harris,* 41 Cal. App. 34, 37 [181 Pac. 676]; *Treadwell* v. *Nickel,* 194 Cal. 243, 264 [228 Pac. 25]; *Johnson* v. *Clarke,* 98 Cal. App. 358 [276 Pac. 1052].)

Judgment reversed.

Sturtevant, J., and Koford, P. J., concurred.

A petition for rehearing of this cause was denied by the District Court of Appeal on September 19, 1929, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 17, 1929.

All the Justices present concurred.