[L. A. No. 7072. In Bank.—May 16, 1923.]

In the Matter of the Estate of JAMES A. McDONALD, Deceased. H. D. McDONALD, Respondent, v. BERT H. McDONALD et al., Appellants.

[1] ESTATES OF DECEASED PERSONS—WILL CONTEST—UNSOUND MIND —SUFFICIENCY OF EVIDENCE.—In this proceeding to set aside the probate of a will it is held that the evidence was sufficient to sustain the finding of the jury that decedent did not have testamentary capacity.

[2] ID.—FALSE STATEMENTS—INFLUENCE ON TESTATOR—EVIDENCE.— In a proceeding to set aside the probate of a will, where one of the issues was fraud, under that issue it was proper to receive evidence of false statements made to prejudice the contestant in in the eyes of the decedent.

[3] ID.—WITNESSES—EXAMINATION.—In such a proceeding there is no error in permitting one of the executors and a beneficiary under the will to be examined as an adverse party under section 2055 of the Code of Civil Procedure, he not having joined in opposing the contest, although he would have received more property if the will were set aside than he would under it, as he was a competent witness and the method of examination was in the discretion of the court.

[4] ID.—CROSS-EXAMINATION.—In such a proceeding there was no prejudice in permitting one of the beneficiaries to be asked if he had not called the contestant an opprobrious name, for the purpose of showing the hostility of the former to the latter.

[5] ID.—INSTRUCTIONS.—It is not a sufficient predicate for a claim of error that instructions which properly state the law have been rejected. The assignment must go further and point out wherein the subject of the instruction was not in fact covered by those actually given.

[6] ID.—BURDEN OF PROOF.—In this proceeding it is held that there was no error in giving a certain instruction with reference to the burden of proof, which it is claimed assumed that the will in question was prepared at the instance of one or all of the beneficiaries.

APPEAL from a judgment of the Superior Court of Los Angeles County. Paul J. McCormick, Judge. Affirmed.

·1. What constitutes capacity or incapacity to make will in general, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

The facts are stated in the opinion of the court.

H. A. Massey and Peyton H. Moore for Appellants.

John C. Miles for Respondent.

LAWLOR, J.—James A. McDonald died September 12, 1920, leaving a purported will dated August 20, 1920, which was duly admitted to probate. By it he bequeathed and devised the bulk of his property in varying amounts to his half-brothers, Dan C. Mulock and Will C. Mulock, and to his nephew, niece, and sister-in-law, Bert H. McDonald, Florence McDonald Fitzpatrick, and Lillie H. McDonald. The latter are the son, daughter, and wife, respectively, of decedent's brother, H. D. McDonald, to whom decedent left nothing. Bert H. McDonald and Will C. Mulock were named executors of the will. On December 20, 1920, H. D. McDonald instituted this proceeding to set aside the probate. The grounds of his contest were alleged unsoundness of mind of the decedent, undue influence, and fraud exerted by Bert H. McDonald and others upon decedent which caused him to execute the will in question. Bert H. McDonald, Florence McDonald Fitzpatrick, and Lillie H. McDonald filed an answer to the petition in which they denied these allegations. Upon the trial the jury returned a special verdict in favor of contestant upon each issue save that of fraud, which was not submitted to them. From judgment rendered thereon proponents take this appeal.

1. It is claimed by appellants there was no evidence to support the verdict of the jury that decedent was of unsound mind at the time he executed the will or that he was induced to sign the will through undue influence. The evidence as to decedent's testamentary capacity consisted principally of the testimony of acquaintances and relatives, who described decedent's conduct, both as to his actions generally and with reference to his conduct on specific occasions, and gave their respective opinions that he was or was not sane. No expert witnesses were called. Inasmuch as it is our opinion there was sufficient evidence to support the finding of testamentary incapacity, an extended review of the evidence on behalf of appellants is unnecessary. The witnesses to the will, W. M.

Northrop and H. S. Farrell, who were two attorneys having their offices together, both gave their opinion that decedent was rational and sane, as did their stenographer. Two grocers, a plant fumigator, and a bank teller with whom decedent had done business, several neighbors, an attorney who had examined decedent as a witness in a case some years before, and appellants Bert H. McDonald and Florence McDonald Fitzpatrick also testified to the same effect. These witnesses stated variously that decedent was able to carry on a connected conversation, that he talked intelligently about his crops, the care of his ranch and other subjects, such as the work one witness was doing in a shipyard. They based their opinions that he was sane upon these grounds.

On the other hand, the witnesses for respondent were unanimous in declaring decedent to have been irrational and insane. From their testimony, which the jury apparently accepted, it appears that decedent lived alone on an orange ranch near San Marino which he owned, that it was his custom to go about the place almost nude, often wearing only a pair of trousers, and that he was in the habit of bathing in his yard. When respondent and others attempted to get him to change his habits in this respect, the neighbors even threatening him with arrest, he informed them the ranch was his and that he would do as he pleased on it. He habitually talked to himself, often in an abusive manner, concerning some unidentified third person or some woman. His conversation was disconnected and he would suddenly change from one subject to another; he seemed unable to talk connectedly for any length of time on any particular subject; he talked foolishly and one witness stated he "jumbled" in his talk. His memory was poor. He was under the impression his neighbors were trying to poison his horses and steal his fruit; upon one occasion he refused to pay a Japanese who trimmed his orange grove on the ground that he had put poison on the trees to make the blossoms fall off so there would be no crop. Some years before his death respondent had had a cottage built on decedent's ranch and decedent refused to allow the ceiling to be plastered because the plastering would fall in the night and kill him. Before the house was built, decedent slept on a cot in the barn, and upon one occasion he attacked with

a pitchfork a man who was working for him because, as decedent said, he was piling bales of hay so they would fall on him and kill him while he was asleep. He attacked a neighbor with a shovel and called him and his daughter vile names because he claimed they were interfering with the water on his place. In none of these instances were his suspicions justified.

Decedent had refused to register to vote for school bonds because wherever there was a school "there was always a minister that bobbed up" and he refused "to be mixed up in any minister's doings." In addition, he said if he registered he would have to be on the jury and then someone would come and steal his livestock and poison his horses. It appears he had owned some horses that had died, but respondent testified that some of them were shot because of glanders and the rest died of old age and the way decedent cared for them. There was evidence of other similar irrational acts and statements.

These characteristics alone, although indicative of an unbalanced mind, not being shown to have affected the making of the will, might not be sufficient to establish the want of testamentary capacity. But it further appears that he entertained delusions respecting respondent which so seriously affected his relations with him that they might well have been found to have affected the making of the will. Before 1913 respondent handled decedent's crops for him and marketed them. In that year decedent accused respondent of robbing him of part of his crop and insisted his statement of the crop was not correct. From then on decedent accused respondent, although the latter left the statement with decedent for verification and heard nothing more about it. Respondent stated his account of the crop was true, fair and honest. Before going to live alone on his ranch, decedent had lived with respondent and his family, but had left them because he thought they were trying to poison him. He accused respondent of stealing eggs, vegetables, and other things from his ranch and of coming down to his place at night, throwing stones on his house, bothering appellants Bert McDonald and Florence McDonald Fitzpatrick and trying to get their property away from them. He further insisted he had given respondent the ranch the latter occupied. Respondent testified that none of these things was true. He

also stated he had tried, without success, to convince decedent that his ideas were mistaken, asking him to come out and chase whoever was throwing rocks on his house, saying he would find respondent in bed at the time. Decedent replied that ''Bert says that you want to get me out of here, to kill me, coming down here throwing these stones to get me out here to kill me. That is it.''

As further tending to show decedent's inability to understand his relations with those about him is the fact that in his will as executed he made a provision for his sister, Mary Mulock, in case she should leave a convent in which she was living. Will C. Mulock testified that Mary Mulock died in 1919 and that he told decedent of her death in the same year. That decedent had realized she was dead is shown by the fact that he informed respondent of her death before he made the will. Respondent testified decedent once told his mother she was not his mother, but that she had stolen him from someone else. She was unable to convince him he was mistaken.

Respondent and Will C. Mulock testified decedent did not attend to any business matters of any importance, although there is evidence that he bought groceries each week and was able to add the items to the extent of a few dollars. Before the dispute in 1913 over the statement of the crop, respondent took care of his property and crops. After that time Will C. Mulock tended to his affairs. Respondent and Will C. Mulock bought, sold and leased his property and sold his crops, and Will C. Mulock testified decedent attended to practically no business unaided. He appears to have felt he must consult them about everything, including such matters as registering to vote on the school bonds, above referred to, and as to what attitude he should take on the matter of putting in a road which the community desired to have constructed. Will C. Mulock stated that at one time he sold a piece of decedent's property for six thousand five hundred dollars and tried to get decedent to invest the money in government bonds, which decedent refused to do on the ground the security was not good. Decedent told various persons his brothers handled his business affairs for him and respondent testified decedent had no business capacity whatever. It also appears that shortly before his death appellant Bert H. McDonald made arrange-

ments to have decedent's orchard fumigated. According to W. M. Northrop, who drew decedent's will, at the time he made it, the following conversation ensued: " 'Now, what other property have you, James?' [besides the ranch and some notes], and he said 'Why, some lots.' And I said, 'What else?' and he said, 'Nothing else.' I said, 'How about any money? Do you have that?' 'Oh,' he said, 'I have sometimes some money in the bank, more or less.' I said, 'Then besides these notes that you are giving by the will, and your ranch, you have got the lots and the money. Now, what do you want to do with those?' and he says, 'I hadn't thought of that.' "

[1] From the foregoing evidence, we are of the opinion the finding of the jury that decedent did not have testamentary capacity cannot be disturbed. Under the often quoted rule laid down in *Estate of Motz,* 136 Cal. 558 [69 Pac. 294], "If he is able to understand and carry in mind the nature and situation of his property and his relations to his relatives and those around him, with clear remembrance as to those in whom and those things in which he has been mostly interested, capable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty, free from any delusion, the effect of disease, which might lead him to dispose of his property otherwise than he would if he knew and understood what he was doing, he has the capacity to make his will." In the case at bar decedent's fixed attitude of hostility toward respondent, apparently unwarranted, his failure to realize that his sister was dead and his belief that his mother was not his mother might have persuaded the jury that he did not have an understanding of his relation to the natural objects of his bounty. From the evidence that his brothers attended to all his property matters, the fact that he had no business capacity, his impression that he had given respondent the farm which respondent occupied, and his failure to think of his money when he made his will, the jury might have found he was unable to carry in mind the nature and situation of his property.

We are referred to *Estate of Redfield,* 116 Cal. 637 [48 Pac. 794], and other cases wherein it was held that lapses from the normal, hallucinations, and delusions which do not affect the testamentary disposition are not sufficient

grounds for setting aside a will. But, as already pointed out, the peculiarities of mind of the decedent herein were calculated to affect the making of the will and were such as the jury might have found did impair his testamentary capacity.

Appellants lay stress on the testimony of W. M. Northrop, who drew up and witnessed the will, as showing decedent was in possession of all his faculties at the time the will was signed. This testimony merely raises a conflict with that tending to show testamentary incapacity and we cannot say the jury were bound to accept it as against the evidence offered on behalf of respondent. It is further claimed by appellants that the provision for decedent's sister in the will after decedent knew of her death shows nothing more than a lack of memory. But in view of decedent's other mental aberrations, his delusions concerning respondent and his erroneous ideas as to many past occurrences, such as the death of his horses, the jury might have attached greater significance to the provision for the sister than that it was a mere lapse of memory.

In view of our conclusion that the allegations of unsoundness of mind were sustained, it is immaterial whether or not the will was the product of undue influence, and it is unnecessary to discuss the evidence addressed to that issue. (*Estate of Baker*, 176 Cal. 430, 437 [168 Pac. 881].)

2. It is insisted the court erred in permitting appellants Bert H. McDonald and Florence McDonald Fitzpatrick to be examined on the subject of a property settlement between respondent and his wife; as to the respective parcels and value of property owned by them; and in an attempt to show the relative wealth of respondent and appellants. The evidence shows that some years previous to decedent's death respondent and his family had become estranged; that respondent and his wife, Lillie H. McDonald, had separated and that respondent had made a property settlement with her. In paragraph III of the second cause of action of the petition it was alleged that, pursuant to a conspiracy on the part of appellants to secure possession and control of the community property of respondent and his wife and of his separate property, respondent was prevailed upon to enter into the agreement, whereby he was forced to accept certain property in lieu of his interest in the com-

munity property; that he assigned to appellant Lillie H. McDonald approximately one hundred and fifty thousand dollars, and that he received under the agreement five thousand dollars worth of property and seventy-five dollars per month. These allegations of the petition were stricken out on motion of appellants. Part of the evidence objected to consists of testimony of appellant Bert H. McDonald to the effect that the ranch which he, his mother, and respondent formerly occupied, stood in the name of his mother and had been deeded to her about 1880 or 1884. Even if this evidence were irrelevant, appellants could not have been prejudiced by it. The only question objected to in the trial court was the one concerning who, at the time of the trial, was occupying the ranch which appellant Bert H. McDonald, his mother and father occupied five or six years before, to which the witness replied that it stood in his mother's name. He had previously stated, without objection, that he had lived in Alhambra five or six years and that prior to that time he had resided with his mother and father on the ranch "that my mother owns in San Marino." This answer was practically the same as that objected to and renders the error, if any, harmless.

Further objection upon the same ground is made to certain testimony elicited from appellant Florence McDonald Fitzpatrick on cross-examination. This witness was called on behalf of the appellants and on direct examination testified that she had told decedent they had given respondent about fifty thousand dollars in property and promissory notes, a life estate in four acres of land, and an allowance of seventy-five dollars a month; that decedent thought seventy-five dollars a month was too much money and that respondent should make a living off the four acres. The witness W. M. Northrop had also testified for appellants that decedent told him "Henry has enough" when asked whether he wished to make any provision for respondent in his will. The testimony of Florence McDonald Fitzpatrick, which appellants now insist was erroneously admitted, was brought out, according to a statement of counsel for respondent at the time it was offered, to show her consciousness of the falsity of the statement she made to decedent, as tending to prove the perpetration of a fraud on him. The court stated explicitly that the evidence was

purely collateral, as a showing of what property the various parties had was relevant only to indicate the state of mind of decedent, and the jury was directed not to consider it for any other purpose. The testimony objected to was elicited after counsel for respondent asked the witness whether she remembered where and when she got the property she gave to her 'father. An objection to this question was sustained. Thereupon she was asked if she saw the fifty thousand dollars handed over to respondent, and she explained, over an objection, that the fifty thousand dollars consisted of three lots in the city of Alhambra, some shares of stock and notes. She admitted the notes were executed by respondent and made payable to her mother; that until six years previously her father con-- ducted the orange grove where the family lived; that her father and mother were not divorced. Upon her redirect examination she was shown a receipt, signed by respondent, for property purporting to amount to about fifty thousand dollars, which was offered and received in evidence over respondent's objection as tending to prove the truth of her statement. On recross-examination she stated she did not think she was the owner of property that stood in her mother's name before 1915 or before 1910, but that she had received a conveyance of property from her mother. This testimony, to which the objection was directed, was brought out by counsel for respondent in an endeavor to show the falsity of the receipt; also what the witness knew about it.

[2] At the time this evidence was introduced the issue of fraud had not been withdrawn from the jury. Under that issue it was proper to receive evidence of false statements made to prejudice respondent in the eyes of decedent (*Estate of Benton,* 131 Cal. 472 [63 Pac. 775]), although, as stated by the court, it would have been error to have admitted the testimony to show what property the parties owned, as tending to prove which had the greater natural right to be the object of decedent's bounty. (*Estate of Kaufman,* 117 Cal. 288 [59 Am. St. Rep. 179, 49 Pac. 192].) In view of this circumstance we cannot say the court erred in admitting the testimony in question, which undoubtedly did tend to prove whether or not the representa-

tion which appellant Florence McDonald Fitzpatrick made
to decedent was fraudulent.

[3]  3. The next assignment of error is to the action of
the court in permitting Will C. Mulock, one of the executors
of and a beneficiary under the will, to be examined as an ad-
verse party under section 2055 of the Code of Civil Pro-
cedure (as added by Stats. 1917, p. 58), he not having
joined in opposing the contest. It is insisted that he
should not be considered a party under that section, inas-
much as he was a half-brother of decedent and would receive
more property if the will were set aside than he would
under it and that his interests therefore really lay with
respondent. This witness was perfectly competent to testify
in the case regardless of the provisions of section 2055
of the Code of Civil Procedure, and it is not shown by ap-
pellants that any evidence elicited by way of cross-examina-
tion under section 2055 would not have been admissible
under the general rules of evidence, nor is it shown in what
manner appellants were prejudiced, if at all, by this manner
of examining the witness. The method of examining wit-
nesses is largely in the control and discretion of the trial
court, and the evidence in question being relevant, it is not
important how the examination was characterized. The ap-
pellants have shown no prejudicial error in the method of
examining this witness.

[4]  4. The court reluctantly permitted the appellant Bert
H. McDonald and Will C. Mulock to be asked if the former
had not called his father a certain opprobrious name. The
purpose of this evidence was to show the hostility of the
witness Bert H. McDonald toward respondent, his feelings
being a proper subject of inquiry upon cross-examination.
In view of the fact that appellants' counsel admitted that
such a feeling of hostility existed and the fact that the
record contains abundant evidence of appellant's bitterness
toward his father, it cannot be held that proof of the use
of the opprobrious term, even if erroneous, would be
prejudicial. Restrictions upon the right of cross-examination
in this regard result more from the necessity of confining
the case to the issues on trial than because of the incom-
petency of evidence of specific acts of hostility.

5. Appellants complain of the refusal of the court to
give a large number of instructions proposed by them

relating to the subjects of insanity and undue influence. The jury was fully instructed on those subjects and no defect in the charge given is pointed out which would have been obviated by the instructions proposed and refused.    [5] It is not a sufficient predicate for a claim of error that instructions which properly state the law have been rejected. The assignment must go further and point out wherein the subject of the instruction was not in fact covered by those actually given.

[6]    6. The appellants' sixth assignment of error relates to an instruction with reference to the burden of proof.    It is claimed that this instruction was erroneous because it assumed that the instrument was prepared at the instance of one or all of the beneficiaries or proponents, in which event it was declared that the burden was upon the proponents to show that the will was read to the deceased or that the deceased thoroughly understood its contents and that he had a clear conception of his act.    The complaint made to this instruction is in the following language: "From the foregoing, it will be seen that the trial court submitted to the jury the issue as to whether the will in question was prepared at the instance of one or all of the beneficiaries or proponents of the same. . . . This instruction was submitting to the jury an issue of which there was no testimony to support, and the giving of the same could not fail to be reversible error."    There is no merit in this contention.    If, as appellants complain, the beneficiaries did not assist in the preparation of the will, the instruction by its own terms was to be disregarded by the jury.    On the other hand, there was evidence, as respondent contends, which might have justified the jury in concluding that the will was prepared at the instance of the proponents and of the beneficiaries therein.

The judgment is affirmed.

Wilbur, C. J., Myers, J., Seawell, J., Kerrigan, J., Lennon, J., and Waste, J., concurred.