[Civ. No. 6202. Third Appellate District.—March 21, 1940.]

In the Matter of the Estate of PETER HANSEN, Deceased. CARL THOMSEN, Respondent, v. CHARLES HANSEN, Appellant.

George R. Freeman and Elmer Laine for Appellant.

Ware & Ware for Respondent.

THOMPSON, J.—On rehearing we have modified certain statements of facts contained in our former opinion. Otherwise we adopt that opinion as a correct determination of the issues presented, as follows:

Charles Hansen offered for probate the alleged last will of his brother Peter Hansen, deceased, dated November 26, 1936,

by the terms of which the proponent was made sole devisee and executor of the estate. The will was contested by Carl Thomsen, an intimate friend and benefactor of the deceased, with whom he had lived for twenty years. Thomsen held a ten-year lease on the ranch which was the chief subject of controversy. He was also named as devisee of a portion of that ranch in a former will which was executed a few months prior to the making of the instrument which is involved in this suit. A jury found that the last will was procured by fraud and undue influence of Charles Hansen, and that it was void for lack of testamentary capacity of the maker thereof. A judgment refusing to admit the will to probate was accordingly rendered. From that judgment this appeal was perfected.

It is contended the special findings and judgment are not sustained by the evidence, and that the court erred in instructing the jury with respect to the presumption of fraud and undue influence which follows from proof of a confidential relationship between the maker of a will and a beneficiary who is active in its preparation.

In spite of a conflict of evidence upon the essential issues of this case, the following statement of facts satisfactorily appears from the record in support of the findings and judgment.

Peter Hansen was born in Denmark in 1866. He had five brothers, of whom Charles was his junior by six years. Peter moved to America and settled in Butte County, California, in 1888. For nearly ten years these two brothers were engaged as partners in farming and in the business of freighting over the mountains. Differences arose between them and their partnership was dissolved. Thereafter they rarely associated or even met each other. They lived on separate farms forty miles apart. Peter bought a small ranch in Butte County where he lived alone for several years. He was never married. Peter was always a frugal and industrious man. He lived modestly, paid his debts and saved money. He was naturally active, intelligent, good-humored and friendly. He was orderly, cleanly and neat in his personal appearance and habits. He was a constant reader of newspapers and kept himself well informed on subjects of common interest.

He gained a large circle of friends and acquaintances who held him in high esteem. He was honest, just and reliable.

After the dissolution of their partnership, Charles prospered for a time, accumulating a large amount of real and personal property. In 1919 he was estimated to be worth approximately $150,000. He drove a Cadillac automobile, and was fond of display. Peter had the impression that Charles had become arrogant and proud, and that he considered himself superior. Peter said they got along amicably while they were poor, but as soon as Charles became rich he began to "high-hat" him. They severed business relations twenty years before the execution of the will and rarely ever visited or associated with each other except as they casually met at Chico. Carl Thomsen, with whom Peter had resided for nearly that length of time, said that he had never seen Charles until seven years after he met Peter. Charles was married and lived near Red Bluff, while Peter resided at Vina Station in Tehama County. The other four brothers never left Denmark. No correspondence was carried on with any of them for several years.

In his prosperity during good times, Charles became extravagant and careless. During the depression which began with the crash in 1929, he lost his property. By 1932 he was impoverished and frequently borrowed small sums of money from Peter. Peter was disgusted with his brother and often criticised him, complaining that he was always trying to borrow money from him. Peter lost confidence in him and refused to engage in the sheep business with him. On the contrary, Peter was frugal, conservative and careful. He gradually accumulated property of considerable value in spite of the hard times and depression which ruined so many farmers.

Carl Thomsen was a countryman of the Hansens. He was twenty-five years younger than Peter. He moved from Denmark in 1910 and located in Butte County, working for several years as a farm hand. He was an industrious and capable farmer. He was honest and reliable. He soon married an attractive, worthy woman. Almost immediately after their marriage Peter met and acquired a great friendship for both Mr. and Mrs. Thomsen which lasted without impairment until a brief time before his death. Peter lived in their home

for several years, contributing liberally to the cost of their maintenance.

Peter Hansen sold his farm in 1919 for $14,000 and bought a 210-acre fruit ranch at Vina Station in Tehama County for $30,100. He paid $10,000 cash, and secured the balance of the purchase price with a trust deed. The southerly 68 acres of that farm were separated from the remaining portion by a double row of trees extending along either side of a roadway. The northern part of the place, above the lane, contained the most valuable, tillable soil. The improvements consisted of a dwelling house and other farm buildings. Upon acquiring this farm Peter immediately invited Mr. and Mrs. Thomsen to live with him and to help take care of the premises. It thereafter became and was their home until the time of Peter's death. They lived together happily. The Thomsens respected and looked after Peter's interests faithfully as long as he lived just as they would have treated their own father. Until the last few weeks of his life Peter appreciated their service and care for him and he was as fond of them as though they were his children. The Thomsens had two adopted children. Peter was attached to them as deeply as though they were his own grandchildren. He was furnished a comfortable room in the dwelling house and a place of honor at the table. For the first few years Carl was paid no regular wages, but Peter contributed liberally to their maintenance. The respective parties were contented and satisfied with the arrangements. Thomsen worked with Peter on the farm and helped him to construct several buildings. They lived as one family in perfect harmony.

As Peter Hansen grew older he sought to avoid the responsibility of operating his farm. In 1923, by mutual agreement, he leased the farm to Carl Thomsen for a term of ten years for a cash rental of $3,000 per year. Thomsen purchased and furnished the farm equipment, including a tractor and other machinery. He also owned an automobile. Peter continued to remain with the Thomsens as a member of their household exactly as he had previously lived, without being required to pay board or rent, although he made substantial contributions to their maintenance. It was agreed that Peter should pay the cost of irrigating the farm. Thomsen's farming enterprise prospered for several years and he paid his rent

promptly. Peter reduced his mortgage of $20,000 to the sum of $6,200. Thomsen built a hog pen, fences and other improvements at his own expense in the sum of about $1500. The depression arrived. Farming became more difficult. Products were hard to market at a profit. Many farmers became bankrupt. Thomsen was industrious and frugal, but he was then unable to clear a profit sufficient to enable him to fully pay his stipulated rent. Peter never complained. He told Thomsen to "Go ahead and pay whatever you can". During the last years of his first lease Thomsen was in arrears in payment of his rent to the extent of several thousand dollars. During those latter years, by common consent, the taxes, interest on the mortgage, and operating expenses of the farm were first paid, and the balance of the net proceeds from the farm were divided equally between Thomsen and Peter. In 1935, Peter suggested that Thomsen should pay him in lieu of the agreed rent of $3,000 per year, one-third of the gross receipts from the farm, which was done. The relationship between Peter and the Thomsen family continued to remain pleasant and agreeable. Peter never complained of Thomsen's treatment of him until a few weeks before the last will was executed.

Upon one corner of his ranch, Peter constructed a gas station, called the "Owl Service Station". For several years it was rented and operated by A. L. Wood, a friend of his. Later it was rented and operated by Mr. James D. Armstrong. Peter often visited and lounged about that station. He was well acquainted with both renters. When hard times came and the farming enterprise became discouraging, Peter often told Carl Thomsen that if he and his family would remain with him on the farm while he lived he would give him a portion of the ranch. Peter had become very dependent upon Thomsen and his wife. Although he often criticised his brother Charles, Peter always told Thomsen he intended to leave his brother the southerly 68 acres of the farm. He explained that he was going to do that "just because he is my brother". The relationship between Peter and the Thomsens was always so considerate that some of the neighbors got the impression Peter was the father of Mrs. Thomsen. Peter rode with them in their automobile. They usually took him with them on their pleasure excursions.

In the summer of 1936, Peter began to talk to Thomsen of renewing his ten-year lease of the farm. It expired that fall. Peter had then become quite deaf. He had acquired some ailments. He did not always feel well. He was then 70 years of age. He anticipated that he might not live for many years more. Still he was clear-minded, comparatively alert, and continued to follow the same cleanly and orderly habits with which he was accustomed to live.

In July, 1936, Thomsen took Peter to Black Point in Marin County for the benefit of his health. After remaining there for a few days, and receiving no benefit, they returned July 28th, by way of Orland, where Peter consulted his physician, Doctor H. H. Beck, who told him he had high blood pressure and that he was in great danger of receiving a paralytic stroke. The doctor then advised him that if he had any unsettled business he had better attend to it.

Before going to Black Point Peter called at the office of the law firm of Ware & Ware in Chico. They had previously acted as his attorneys. He asked Mr. Phil Ware whether a ten-year lease of his farm would remain in force during the entire term, in case he renewed it, even though he should die in the meantime. He was told that it would remain valid during the entire term whether he lived or died. He told Mr. Ware that was exactly what he wanted. Mr. Ware then wrote on a slip of paper a memorandum explaining the effect of a renewal of the lease for a further term of ten years, which was found among the papers of Peter after his death. Peter left the attorney's office saying he would return later and have that renewal of the lease drawn.

The day after Peter's return from Black Point he told Thomsen he wanted to go to Chico and get the lease and a will drawn. He was anxious to renew the lease before he died. He was reminded that the doctor advised him he should not travel in his physical condition. He was then feeling badly. Peter instructed Thomsen to telephone to his attorneys and ask one of them to drive out to the farm and draw those instruments for him. Thomsen promptly called Mr. Allison Ware, who drove out to Vina Station that evening in response to the message and fully discussed the terms of the proposed renewal of the ten-year lease in the presence of both Carl Thomsen and Peter. Mr. Ware was well ac-

quainted with Peter Hansen. He had known him for eighteen years and had occasionally represented him in a number of legal transactions. Peter said that the reason he wanted to make another ten-year lease to Thomsen was that he was perfectly satisfied with his fulfillment of the last one, and that, while he intended to leave his brother Charles the southerly 68 acres of the farm, he wanted to keep the entire ranch intact for that period of time, thinking that if his brother was hard up and needed money Mr. Thomsen might buy the 68-acre tract from Charles and pay cash for it. Peter took from his private box the original ten-year lease and exhibited it to Mr. Ware. He told the attorney he wanted to renew that lease. He also inquired from Mr. Ware, as he had previously asked his brother Phil, whether the proposed ten-year lease would be valid for the entire term in case he should die in the meantime. Mr. Allison Ware assured him that it would remain valid. He told the attorney he wanted to be sure of that fact. That was his purpose in renewing the lease before the term of the original lease expired. Mr. Ware inquired of Peter regarding the details of the proposed lease, and carefully made notes from which to draw the lease. Peter Hansen knew exactly how he wanted the lease drawn. He directed the attorney with respect to all of its essential terms. Peter then talked with Mr. Ware about preparing a will for him. He told the attorney the reason he wanted to give the northerly portion of his ranch to his friend Carl Thomsen, subject to his payment of the balance of the mortgage remaining against the property, which amounted to $6,200, was to reward him for his kindness and service. He also wanted Thomsen to have the remaining personal property, and to be appointed executor of the will. In accordance with his frequently-expressed desire, he wanted Mr. Ware to provide that his brother Charles should be given the southerly 68-acre tract, free from the mortgage, subject, however, to the proposed ten-year lease. During the time the terms of that will were being discussed, Mr. Thomsen was absent from the room. Having obtained the required information, the attorney returned to Chico and procured the typing of both the lease and the will on the following day. By agreement, he returned that evening with the two documents, accompanied by Colonel Thompson, who was requested to act as a witness

to the will. The lease was carefully read and its terms were explained in the presence of both Peter and Mr. Thomsen. It was then formally executed by them. The lease was impartially drawn in substantially the same terms contained in the former ten-year lease, and in the exact manner directed by the lessor. It contained the usual formal covenants fully protecting the interests of Peter Hansen according to his instructions.

After the lease was executed, Mr. Thomsen left the room, and the will was read to Peter Hansen and carefully explained in every detail by Allison Ware. Colonel Thompson was then called into the room, and the terms of the will were again read and explained in his presence. Peter expressed his entire approval of the terms of the will, and formally executed it in the presence of those gentlemen, requesting them to sign it as witnesses, which they did in the manner required by law. A carbon copy of the essential portions of the will was left with Mr. Hansen by the attorney. The original will was handed to Mr. Ware with the request that he should keep it for the testator, which he did. It is an admitted fact that Peter Hansen was of sound mind when that will and lease were executed. The lease was subsequently acknowledged before Mr. H. M. Hersey, a notary public of Tehama County, and recorded by him at the request of Peter Hansen.

After July, 1936, Peter Hansen's physical and mental ailments developed very rapidly. His cleanly and orderly habits changed. He refused to bathe. He frequently soiled his clothing and the bed. He did not realize the disorderly condition in which he often appeared at the table and in the presence of other persons. He made no attempt to avail himself of the facilities to relieve the demands of nature. He lost his sense of propriety and abandoned the customary rules of behavior in his association with other individuals. He went about the house and on the public streets with his clothes unbottoned and his shoes unlaced. He ceased to read or talk to his friends. His mind wandered. He wept. Without reasonable cause, he lost his love and attachment for Mr. and Mrs. Thomsen and their children, of whom he had previously been very fond. He became suspicious and extremely critical of them. He frequently visited the Owl Service Station and talked with Mr. Armstrong about them. Armstrong was un-

friendly with Mr. Thomsen and appears to have prejudiced Peter against him. Without just cause, Peter acquired the fixed delusion that Thomsen was taking advantage of him, and that he had in some way procured the execution of the first will in his own favor. He asked him how his name came to be placed in the will. He charged Thomsen with obtaining unjust and detrimental terms to be included in the ten-year lease. Substantial evidence refutes the truth of those accusations. The record satisfactorily shows that both instruments were not only fair and reasonable in their terms, but that they were prepared in the exact manner and form directed by Peter Hansen. He was confused and irrational regarding the specific terms of the instruments of which he complained, except that he seemed to be impressed with the conviction that the ten-year term of the lease was too long a period of time and that it was so drawn contrary to his wishes. That was evidently not true. Regarding that feature of the lease, there appears to be no doubt the long term of ten years was precisely what he requested and wanted to provide for.

Immediately before the last will was executed it appears that Charles Hansen arranged for and secretly met his brother Peter and Armstrong at the Owl Service Station, which gave them the opportunity to exercise undue influence upon Peter. It seems probable, as the jury found, that they did prejudice and control the mind of Peter so as to persuade him to execute that last will in the interest of Charles. The evidence satisfactorily shows that until a few days before that will was executed there had been only casual association between the brothers for several years. Armstrong was the man who arranged for the secret meeting. Peter charged Thomsen with recording the lease without his consent. The evidence shows that it was acknowledged and recorded by H. M. Hersey, the notary public, at the request of Peter Hansen.

On Sunday evening preceding Thanksgiving Day in 1936, Charles Hansen took a copy of the last lease to his attorney at Willows and consulted him about the prospect of breaking that instrument. That lawyer had been Charles' regular attorney for many years, although he had never met his brother Peter. By previous arrangement, without notice to the Thomsens, Charles called at the gas station early on Thanksgiving morning, and took Peter in his automobile to Willows to in-

terview his attorney. Peter then had in his pocket copies of the lease and of his first will. Upon inquiry, Peter told the lawyer regarding the lease that "He didn't know what he was signing when he made it, that under it he didn't have any rights at all". The attorney examined the lease and told Peter he had "a tough job ahead of him to break that lease". In fact, the lease seems to be fair and impartial. It appears to adequately protect the rights of the lessor. It is couched in the usual terms, and contains the customary covenants of a carefully prepared lease of that nature. It was fairly drawn in every respect in the exact manner and terms directed by Peter. Finally Peter drew from his pocket the carbon copy of his first will and handed it to the attorney, who said, "Well, apparently you have made a will?" To this inquiry Peter replied, "No, he didn't make a will". In spite of the fact that he brought with him the carbon copy of the will, he had no recollection of having made that instrument. The attorney then testified that when he told Peter Hansen there was no reasonable chance of breaking the lease, Peter said, "If I can't do anything with that, *if you say I made a will*, I can fix that. I will make another will". The last will, which is involved in this suit, was then drawn. By its terms Charles Hansen was given the entire estate, including both real and personal property. His other living brothers are not mentioned in the will. Charles was named as executor without bonds. The will was witnessed by the attorney and a friend by the name of Speier, who was called in for that purpose. The will was left in the custody of the attorney, who instructed Peter to obtain his first will from Mr. Ware and destroy it. The first will was delivered to Peter, but he did not destroy it. After the execution of the second will, Charles took his brother back to Vina Station, arriving just in time for him to keep a previous engagement and go with Mr. and Mrs. Thomsen to attend a Thanksgiving dinner at the home of a friend. Peter started to appear at the dinner in a dirty and disorderly condition with his old clothes on. He was persuaded by his brother to change his clothes, but he went to the table with his clothes unbuttoned, his shoes unlaced and without a necktie. He was morose, silent and refused to eat. He wept and wanted to be taken home. He seemed dazed and irrational. When the Thomsens inquired where

Peter had been, Charles said they had gone to Willows to see a real estate man. That was not true. The last will was procured by the influence and activity of Charles. The transaction was conducted in secret.

About the time of the execution of the last will, Peter's physical and mental condition rapidly grew worse. He was nervous and despondent. He wandered about aimlessly. He carelessly walked along the highway and the railroad track without regard to traffic or trains, apparently failing to realize his great danger. He avoided association with former friends. He refused to speak to them. He sat in his own room for hours just gazing about. He frequently wept for no apparent cause. He talked disconnectedly and illogically. He related hallucinations which he had that strange men crept into his bed at night and sapped his strength and manhood. He related that story to his physician. He bought a revolver at Red Bluff for no explained reason. When he was asked by Mr. Hersey what he wanted a pistol for, he said, "Things were bothering him. He had to tend to something." He had never before owned or used a revolver. He offered no rational explanation for purchasing the revolver. When the package containing the weapon reached their home, Thomsen saw it and asked Peter what he was going to do with a gun. Peter cried and said that he didn't know what he wanted it for. Thomsen, as a precautionary measure, said, "I think, Peter, you better let me do the shooting around here". Peter promptly handed him the revolver and said, "I think you better, Charley."

The record is replete with incidents indicating that when the last will was executed, Peter Hansen was afflicted with senile dementia which was developing rapidly. His conduct, conversation and appearance convinced two physicians and many intimate friends and neighbors that he was irrational and incompetent. Doctor Faulkner, whom Peter visited and consulted professionally several times at Red Bluff in the month of October, 1936, testified to the insane delusion related by Peter regarding the strange men who slept in his bed and sapped his strength and vitality. The doctor said Peter really believed it. The doctor was so impressed with the existence of that fixed delusion that he asked Mrs. Thomsen if Peter did not act abnormally about the home. Doctor

Beck, who attended Mr. Petersen, the father of Mrs. Thomsen, frequently in November, 1936, during his last illness, observed Peter about the house during that period of time. He had known Peter for several years. He said that Peter had changed mentally very rapidly; that he no longer knew what was going on about him; that he sat and wept for no apparent cause, and stared at the wall; that he was unclean, exhibited no mentality; that he was of "unsound mind" and that he was afflicted with senile dementia. Certainly he had the symptons of that incurable malady.

Nearly a dozen intimate friends and neighbors testified to acts, conduct and conversations on the part of the testator about the time the will was drawn from which they concluded that he was "mentally deranged", "irrational" or of "unsound mind". The testimony of Mr. Allison Ware, regarding his attempt to converse with Peter when he called to inquire about the lease a few days before he executed the second will at Willows, leaves very little doubt that his mental faculties were sadly impaired, and that he did not comprehend or understand the transaction he was engaged in. Senile dementia is a progressive, incurable form of insanity. The delusions and hallucinations which he possessed are conmon symptoms of that disease. The evidence is very convincing that he had reached a state of mind by Thanksgiving Day, when he executed the second will, that warranted the jury in finding he was then of unsound mind to the extent that he lacked testamentary capacity.

We have not attempted to analyze the evidence of witnesses who testified in behalf of the proponent. It was the province of the jury to weigh and consider that evidence. It is our duty to determine only whether there is adequate evidence to support the findings of the jury and the judgment of the trial court. We have concluded there is sufficient evidence to serve that purpose. It would therefore be an idle task to attempt to review that conflicting testimony.

The record of the testator's banking transactions about the time of the execution of the will furnishes only a conflict of evidence regarding his mental capacity which we assume the jury fully and fairly considered. The jurors were the sole judges of the weight of that evidence. Among a few simple banking transactions two irregular ones may be deemed to in-

dicate a lack of ability to understand the nature of the business affairs. On January 15, 1937, he presented and cashed what is termed a "postdated" or a "flyer check" under date of February 7th for the sum of $10. April 20, 1936, he drew his check for $163.44 in payment of taxes which were not due until November of that year, and that check was not presented or paid until November 27, 1936. The banking transactions are not conclusive evidence of his testamentary capacity.

The last tragic act of the testator's life indicates mental incapacity and a lack of understanding. He did not even exercise ordinary precaution for his own safety. He was extremely deaf, yet he carelessly walked along the railroad track heedless of his danger. A freight train overtook and killed him. The engineer saw him walking along the track, but assumed that he would step from the track when the train approached. He said that Peter seemed to be absolutely unconcerned until it was too late to stop the train.

The record contains an abundance of evidence, in spite of adverse testimony on behalf of the proponent, to support the findings of the jury to the effect that the testator was of unsound mind, that he lacked testamentary capacity, and that the will was procured by the fraud and undue influence of Charles Hansen.

It would be a useless task to attempt to analyze the numerous authorities cited by respective counsel on various phases of this case. Very little difference exists regarding the law which applies to the principles of unsound mind and undue influence affecting the validity of a will. Apparently the chief controversy involves only a correct application of those well-established rules to the particular facts of this case. It is conceded testamentary capacity may be presumed when it appears that the maker of a will is capable of rationally considering and understanding the nature and importance of the act of making his will, the identity, location and character of his property to be affected thereby, and the persons related by ties of blood, affinity or friendship who are normally entitled to his bounty, together with the manner and portions, of his property which he desires to bequeath or devise to each individual. (*Estate of Russell*, 189 Cal. 759, 770 [210 Pac. 249]; *Estate of Ehle*, 115 Cal. App. 656, 660 [2 Pac. (2d)

398] ; 26 Cal. Jur. 638, sec. 12.) These are facts to be determined by the jury from the evidence adduced.

In his contention that the findings of the jury are not sustained by the evidence in this case, the appellant relies chiefly on the *Estate of McDonough,* 200 Cal. 57 [251 Pac. 916], and *Estate of McGuirk,* 50 Cal. App. 352 [195 Pac. 279]. These cases are readily distinguishable on the facts from the present proceeding. In the McDonough case, a judgment based on a finding of a jury that the testator was of unsound mind was reversed for lack of evidence to support it. The Supreme Court said that the acts relied on to show unsound mind were all reasonably attributable to mere infirmities of old age, caprices and idiosyncrasies, and that no witness was willing to testify that he was afflicted with settled insanity. The court said in that regard:

"No substantial evidence, however, tending to establish settled insanity or dementia or insane delusions or hallucinations on the part of the testator was adduced."

In the present case there is definite evidence of hallucinations, delusions and settled insanity, in addition to many circumstances occurring about the time of the execution of the will in question, effecting a radical change in the personal appearance, conduct, conversation and attitude of the testator toward old friends and benefactors, which may be accounted for only by the existence of an unsound mind. His hallucination regarding the unknown men who slept with him and sapped his vitality and manhood; his unwarranted animosity toward his best friend and his fixed delusion that Thomsen had wrongfully procured the lease and will to be drawn in his own interest; the purchase of a revolver for some unexplained purpose and his total ignorance of having previously made a will, strongly tend to show a deteriorated mind in conflict with the existence of testamentary capacity. Doctor H. H. Beck, who had repeatedly attended him professionally, and who had seen him frequently about the time of the execution of the last will, after detailing his reasons for so concluding, testified that "I would say that he was mentally unsound, . . . an indication of senile dementia in a man that age."

The facts of the McGuirk case may likewise be distinguished from those of the present proceeding. In that case a motion

for nonsuit was affirmed. The testator was sixty-two years old. He had suffered a stroke of paralysis. No witness testified that he was afflicted with *settled* insanity. No physician testified to his mental condition. Those witnesses who said that he was of *"unsound* mind" based their conclusions on general statements covering a period of twenty years, such as the assertions that he had said "his neighbors were trying to rob him"; the alleged error in judgment regarding a real estate transaction and other similar incidents reasonably attributable to an irascible old man. These incidents did not occur near the time of the making of the will. The court says that "No attempt was apparently made to show *the time* to which in their testimony the witnesses referred with relation to the time of making the will." The testator drew the will in his own handwriting from a copy furnished to him by an attorney. In that case the court was certainly warranted in affirming the order of the trial court. The facts of this case are much stronger than those of the McGuirk case in support of the finding of testamentary incapacity on the part of the testator. They are certainly sufficient to support the findings of the jury and the judgment óf the trial court.

It is true that proof of hallucinations or delusions is not sufficient in itself to set aside a will unless it further appears that they bear directly on the testamentary act. (*Estate of McDonough, supra.*) One may possess fixed delusions regarding certain things which have no relation to the faculties necessary to be exercised in the drawing of a will. A paranoiac, for instance, may possess insane delusions regarding a particular subject, and yet he may be perfectly sound and sensible on other matters and mentally capable of transacting business which does not involve that defect of mind. Paranoia, in its earlier stages, does not constitute total insanity and therefore may not deprive one of testamentary capacity. The presence of hallucinations or delusions, however, are ordinarily symptoms of insanity. They exist in unsound minds of various types.

In the present case we should consider the evidence of fixed hallucinations and delusions in connection with the doctor's testimony that the testator, about the time of the execution of the will in question, was suffering from senile dementia which is a progressive, incurable form of fixed insanity result-

ing in a total collapse of the mental faculties and, in its final state, necessarily deprives one of testamentary capacity. With that particular malady the victim is robbed of his power to think, reason or act sanely.

In the *Estate of Hartley*, 137 Cal. App. 630 [31 Pac. (2d) 240], it is said that radical changes in a man's habits of thought, conversation, conduct and appearance which affect his ability to understand and appreciate the nature and identity of his property and the individuals who would ordinarily be entitled to his bounty, particularly when he is afflicted with senile dementia, are competent and persuasive evidence of a lack of testamentary capacity.

It is true that both witnesses to the will testified that Peter Hansen appeared to be of sound mind when be executed the will. Both, very reputable men, said that he appeared to be neatly dressed and that he answered questions intelligently. One of these witnesses was the attorney who drew the will, and the other was a business man who was called in for that purpose. Neither of them had ever before seen the testator. They said that he was very deaf and that they were compelled to communicate with him by "hollering at him right to his ear". He merely answered a few simple categorical questions. We do not doubt the good faith of these gentlemen in believing that the testator was mentally competent to execute his will. Their evidence, however, merely raises a conflict. Neither of them had ever before seen the testator. In support of the verdict it may be assumed the jury believed they did not have the opportunity of judging of his mental capacity as accurately as a skilled physician or intimate.acquaintances.

The testimony of an attorney who draws a will, and who also becomes a witness to the instrument, to the effect that the testator appeared to be of sound mind and memory, is entitled to serious consideration. It has been said his evidence may be entitled to *more* consideration than that of a mere relative, friend or acquaintance. But it is not conclusive when other witnesses have testified to the contrary. Such evidence creates only a conflict. The jury must finally determine the weight and sufficiency of the evidence. (*Estate of Nelson*, 134 Cal. App. 561 [25 Pac. (2d) 871]; *Estate of McDonald*, 191 Cal. 161 [215 Pac. 545].) Where there is

substantial evidence to support the finding of a jury on any material issue, its determination of that issue will be upheld.

The appellant insists that the court erred in giving to the jury instruction number 35 to the effect that when a confidential relationship is shown to exist, coupled with activity on the part of a beneficiary in procuring the execution of a will, a presumption of undue influence is thereby raised, and the burden is then cast upon the proponent to show that the will was not procured by undue influence or fraud. That instruction contains the following statement:

"If that burden has not been met, that is, if such person has failed to show by a preponderance of the evidence, an absence of undue influence, then the presumption of undue influence or fraud controls and such will will be invalidated."

█ It is true the authorities hold that the establishment of a presumption does not have the effect of shifting the burden of proof from the party upon whom the affirmative of an issue rests. (*Scarborough* v. *Urgo*, 191 Cal. 341 [216 Pac. 584]; *Valente* v. *Sierra Ry. Co.*, 151 Cal. 534 [91 Pac. 481]; *Estate of Eakle*, 33 Cal. App. (2d) 379 [91 Pac. (2d) 954]; 10 Cal. Jur. 783, sec. 88; 68 C. J. 755, sec. 449.]) █ But when a presumption of undue influence is raised by showing the existence of a confidential relationship, coupled with activity on the part of the proponent of a will, a *prima facie* showing of undue influence is thereby established which, in the absence of evidence to the contrary, necessarily has the effect of invalidating the will because it is then not the result of the free will or volition of the testator. It logically follows that the presumption necessarily results in invalidating the will on that account. Under such circumstances, the presumption becomes controlling. To overcome that *prima facie* showing it becomes necessary for the proponent to rebut the presumption by evidence which, at least, will have the effect of balancing the *prima facie* showing, or the will must be denied probate. █ Technically speaking, it may be true that the language of the challenged instruction goes too far in saying that the proponent must "show by *a preponderance* of the evidence an absence of undue influence". However, it is not necessary for us to determine that question, for undue influence is not the only issue upon which the judgment is predicated. The jury separately found that the will is void be-

cause the testator was of unsound mind at the time it was executed. In instruction number 20 the jury was clearly and correctly charged that upon each ground of contest the burden of proof rested upon the contestant. The challenged instruction had no bearing on the issue of unsound mind. Instruction number 20 reads:

"The burden of proof in this case is on the contestant, Carl Thomsen, to prove that the instrument offered here for probate by the proponent, Charles Hansen, was executed by Peter Hansen, deceased, *while he was of unsound mind* or that it was procured to be made by Charles Hansen by the use of undue influence or fraud *and he must prove one of such grounds by a preponderance of the evidence. There is no burden on the proponent to disprove any of the allegations of contestant's opposition to the probate of the will involved,* and in this case if you find that the weight of the evidence bearing upon the whole case is in favor of the proponent, or that it is evenly balanced, then your verdict must be for the proponent."

In view of the preceding correct statement of the law with respect to the burden of proof, which is specifically made applicable to the issue of unsound mind, the jury could not have been misled regarding that issue. Even though we may believe that the finding of undue influence is ineffectual and void, and that it would require a reversal of the case if that were the only ground upon which the will was found to be invalid, still the separate finding that the testator was of unsound mind and that he lacked testamentary capacity on that account is sufficient ground upon which to support the judgment in this case.

The judgment is affirmed.

Tuttle, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 20, 1940.